UNITED STATES, Appellee,

v.

Tommy L. MORRISON, Sergeant U.S. Air Force, Appellant.

No. 39,566.
ACM 22594.

U. S. Court of Military Appeals.

Jan. 18, 1982.

For Appellant: *Colonel George R. Stevens* (argued); *Colonel Larry G. Stephens* (on brief).

For Appellee: *Captain George D. Cato* (argued); *Colonel James P. Porter, Lieutenant Colonel William H. Seckinger, Major Robert T. Mounts* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried by a general court-martial military judge sitting alone, on May 8–9, 1979, at Hahn Air Base, Germany. Contrary to his pleas, he was found guilty of possessing on September 15, 1978, 22.08 grams of marihuana and 1.94 grams of cocaine, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad-conduct dis-

charge, forfeiture of $200 pay per month for 5 months, and reduction to E–2. After the convening authority approved the findings and sentence, the Air Force Court of Military Review affirmed. 9 M.J. 683 (1980). We granted review (10 M.J. 88) on this issue:

WHETHER THE MILITARY JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED, BY ADMITTING INTO EVIDENCE THE FRUITS OF AN ILLEGAL SEARCH, PROSECUTION EXHIBITS 2, 3, 4, 6, and 7.

I

This case is a companion to *United States v. Ravine*, 11 M.J. 325 (C.M.A.1981), which we recently decided. In each case, the defense contested the legality of a search by German police of an off-post apartment occupied jointly by Morrison and Ravine. In Morrison's trial, the fruits of the search were held admissible, and he was found guilty. In Ravine's trial, which took place on the next day before the same military judge, the search was held illegal. Ravine was acquitted of the charges predicated on the results of that search,[1] although he was found guilty of wrongfully possessing drugs found in his luggage by German customs officials during a search at the German frontier with the Netherlands.

On September 14, 1978, Herr Jansen, a German customs official, entered the compartment occupied by Sergeant Jack Ravine and Donna K. Ravine on a train which had just entered Germany enroute from Amsterdam to Munich. In response to his inquiry, the Ravines denied having any items to declare; but in an ensuing inspection, Jansen discovered in their luggage a bottle containing hashish. Thereupon, Jansen left the train with the two Americans and proceeded to his office in the train station at Emmerich, a town located about five kilometers from the Dutch border. After further testing the suspected contraband, he contacted members of the 42nd Military Police Customs unit stationed in Emmerich;

thereafter the American military police took control both of the Ravines and of the contraband. As Jansen explained, "We, in those cases, don't make any further investigations. We just turn it over to the American colleagues at Emmerich."

Through their office at Bad Kreuznach, the American military police then relayed by telephone to Special Agent Hager of the Air Force Office of Special Investigations (OSI) the following information:

[T]hat one Jack Ravine had been apprehended at the border by Emmerich, Germany, the day previous, which would have been the 14th of September, and in his possession was found 180 grams of hash oil, including the weight of the container. Allegedly, he was travelling with his wife, Donna K. Ravine.

When this information came to the attention of Special Agent Ronald W. Okland, Commander of the OSI Detachment at Hahn Air Base, where Ravine was stationed, Okland "was somewhat puzzled," for he had reason to believe that Ravine's wife was named Sunee and was not present in Europe. Accordingly, he asked that Herr Willie Mohr, his interpreter and investigative assistant, call the German police authorities "to find out more about this incident." First, Okland had Mohr call the German criminal police in Cochem, because their area of jurisdiction included Mittelstrimmig, where Ravine's apartment was located. However, the police in Cochem "had not heard of the border incident; and they suggested that he call Koblenz Customs Police in Koblenz, Germany. And so I directed him to do so."

The purpose of this call was to determine if the German customs police in Koblenz "had any notification of any kind from the German customs police at the border of Emmerich, Germany." Okland could not say "[b]ased on past experience," whether, as a matter of routine, the German customs police would make a search of Ravine's premises upon receiving this call. However, Okland "did make it clear to Mr.

---

1. These specifications corresponded to those on which Morrison was tried.

Mohr, please do not ask, in any way, shape, or form, for any search by them." Moreover, Okland insisted in his testimony that he had not intended to have Mohr initiate any action by the Germans "other than to find out what had happened at the border." At that time Okland did not suspect that the Germans might perform a search based upon the information Mohr would provide them; instead he believed that the customs police already had more information than was possessed either by the OSI or even by the American military police unit at the border. Okland denied that the call to the customs police in Koblenz was a subterfuge or an attempt to instigate a German search.

Upon calling the German customs office in Koblenz, Mohr talked initially to Herr Mueller, with whom he had several previous contacts. He informed Mueller that Jack Ravine, an American serviceman, "had been apprehended at the border . . . [for] possession of hashish oil, and I wanted to know if they have [sic] received a message and if we could get further information about it." Mueller responded that his office had not received a message concerning the incident and, in turn, he asked Mohr for any of the information then possessed by the OSI. Mohr denied that he suggested to Mueller that the Germans search Ravine's apartment, "because I have, during my time with the OSI, always received instructions that we cannot ask the Germans to do anything, except that we request information; and I always strictly comply with what I am told." Moreover, Mohr did not "in any way, offer information in order to suggest to them that a search [should] be conducted."

About a half hour or an hour later, Herr Mueller called back to the OSI office at Hahn Air Base. During one of the conversations with Mueller, Mohr informed Mueller where Jack Ravine resided, since the residence of an American serviceman was "a standard question by the German police" under such circumstances. As to his purpose, Mohr explained: "My only intention was to get information, nothing else; and in order to get information, I, of course, have to provide certain information."

Herr Mueller turned over the investigation to his subordinate, Herr Heil; and "[a]s is customary, Mr. Mueller directed the search of the apartment of Ravine at Mittelstrimmig." At the time when the search occurred on September 15, Mueller and Heil were under the erroneous impression that the apprehension of Ravine at the border had taken place on the same day. Therefore, the Germans did not attempt to obtain a search warrant at that time because they feared that the delay in locating a magistrate might provide an opportunity for the destruction of evidence. When Heil proceeded to the apartment, he began to seek means of entry; at this time appellant drove up in a car with Ravine, who had been released from American military police custody. Thereafter, a search took place; the discovery of drugs led to the charges against appellant. Okland and Mohr were not present while the search was underway; but, in response to a call from Heil, they later proceeded to Ravine's apartment, where Heil gave them the evidence seized during the search.

Upon the evidence presented to him, the military judge found that "the American officials . . . were a conduit through which German information was provided to other German officials." Moreover, he found that the search was not "instigated by the American officials; and . . . it was not conducted or participated in by them"; "that there was no subterfuge or attempt to generate this search"; and that the OSI contact with the German customs police in Koblenz "was motivated solely by a desire to acquire information to be used in other purposes, regarding the wife." The judge also found that the call "was not motivated by the requirements to share information" pursuant to the Status of Forces Agreement between the United States and the Federal Republic. In light of his findings, the judge concluded that the fruits of the German search could properly be admitted at appellant's trial.

Appellant has insisted, both at the trial level and on appeal, that under *United States v. Jordan*, 1 M.J. 334 (C.M.A.1976),

the contraband discovered in the German search should have been excluded from evidence. In this connection, he argues that, regardless of the intent of the OSI personnel, the search was a direct result of the telephone call from Mohr to Mueller and that, absent this call, the search would not have been performed. Moreover, since the Germans customarily searched the residence of anyone who was caught smuggling drugs into Germany, it was quite foreseeable that Mohr's call would precipitate a search by the customs police. Finally, since at the time of the search the Germans called the OSI to come to the apartment and immediately receive custody of the evidence seized, the purpose of the search was obviously to benefit American, rather than German, interests.

## II

Subsequent to his trial appellant filed with the convening authority a document designated "Petition for New Trial," wherein he emphasized that the same military judge had excluded in Ravine's case the evidence seized in the German search of the apartment. In support of this "Petition," he presented certain evidence offered at Ravine's trial, but not at his own. This evidence included an entry in a report made by Herr Heil to the effect that he had performed the search at the request of American authorities for assistance.

The staff judge advocate—although concluding that appellant had not met the requirements of Article 73 of the Uniform Code, 10 U.S.C. § 873, as to petitions for new trial—nonetheless advised the convening authority that Morrison's "petition" could be construed as a brief submitted by defense counsel under Article 38(c) of the Uniform Code, 10 U.S.C. § 838(c), and that the supporting evidence for this document could be considered by the convening authority in his review in this case—except for the purpose of sustaining the findings of guilty. However, the staff judge advocate also expressed the view that; even with the benefit of the additional evidence, which apparently persuaded the trial judge

to make a different ruling the next day in Ravine's case, the convening authority should not grant relief to appellant.

■ We agree with the staff judge advocate that although the convening authority was free to rely on the evidence and outcome in Ravine's trial as a basis for disapproving appellant's conviction, he was not obligated to set aside the findings of guilty. Rulings made by a judge in the trial of one criminal defendant should not estop the Government from seeking a different ruling in the trial of a different defendant, for there is no identity of parties. Moreover, in situations where the doctrine of collateral estoppel or res judicata is applied, usually the prior trial bars relitigation in a later trial, while here appellant seeks to bind the Government by the results in a later trial. Admittedly, inconsistency of jury verdicts is more common than inconsistency in evidentiary rulings made by the same judge; but, so long as each ruling is sustained by the evidence before the judge at the time, inconsistency does not constitute an error of law.

## III

■ In deciding whether in the case at bar the evidence sustains the trial judge's decision to admit in evidence the drugs seized by the German customs police from the apartment shared by appellant and Ravine, we first must consider under what circumstances the exclusionary rule applies to searches and seizures by persons who ostensibly are not acting on behalf of the United States. For six decades it has been accepted that private persons are not subject to the fourth amendment and that evidence obtained as the result of a search by a private person is admissible in a Federal criminal trial. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Goldberg*, 330 F.2d 30, 35 (3d Cir. 1964), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); *United States v. Volante*, 4 U.S.C.M.A. 689, 16 C.M.R. 263 (1954). Of course, there may be difficulty in determining whether someone who conducts a search is really "private,"

see, e. g., *United States v. Volante, supra* ; this is especially true when that person acts in response to information or encouragement from representatives of the Government.[2]

Until *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), repudiated the "silver platter doctrine," state and local police were equated with private persons for fourth amendment purposes, so that evidence seized by them in illegal searches could nonetheless be received in Federal criminal trials. *See Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). Similarly, evidence seized by foreign officials was not subject to the exclusionary rule in a Federal criminal trial unless in some way American officials were involved in the search.

Thus, paragraph 152 of Manual for Courts-Martial, United States, 1951, asserted, "Evidence is inadmissible against the accused if it was obtained as a result of an unlawful search of this property conducted or instigated by persons acting under authority of the United States." Similarly, paragraph 152 of Manual for Courts-Martial, United States, 1969 (Revised edition) provided: "Evidence is inadmissible against the accused: If it was obtained as a result of an unlawful search of the person or property of the accused conducted, instigated, or participated in by an official or agent of the United States, or any State thereof or political subdivision of either, who was acting in a Governmental capacity."

Sometimes, the participation of American officials in a foreign search is readily discerned. *United States v. Armstrong*, 9 M.J. 374 (C.M.A.1980) (military police joining in search of car impounded by German police);

*United States v. Schnell*, 1 M.J. 94 (C.M.A. 1975) (CID agent participating actively in search). Often, however, the Manual's test is more difficult to apply. For example, there has been disagreement as to the weight that should be attached to the presence of American officials during a search purportedly conducted by foreign officials.

In *United States v. DeLeo*, 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954), the Court commented that, in light of American treaty obligations and the desirability of having American representatives present to protect the rights of service members being investigated by foreign officials, "we hesitate to hold too readily that the mere presence of a military investigator during a search by foreign police necessarily renders the proceeding an activity of the United States." Id. at 156, 17 C.M.R. at 156. Moreover, "circumstances which would serve to invoke the principle of the *Byars* case within the confines of the United States might not at all suffice to demonstrate that a search, primarily conducted by French officials in France, should be treated in law as an American investigative proceeding." *Id.* at 157, 17 C.M.R. at 157.

However, in *United States v. Jordan, supra* at 337 (footnote omitted), this Court, after referring to the "continuing difficulty in drawing the line between 'mere presence' and participation,"[3] stated (1 M.J. at 338):

We therefore hold that, for trials by court-martial commencing after the date of this opinion, whenever American officials are present at the scene of a foreign search or, even though not present, provide any information or assistance, directive or request, which sets in motion, aids, or otherwise furthers the objectives of a foreign search, the search must satisfy the Fourth Amendment as applied in the military community before fruits of

2. *Compare United States v. West*, 453 F.2d 1351, 1356 (3d Cir. 1972); *United States v. Corngold*, 367 F.2d 1 (9th Cir. 1966); and *Stapleton v. Superior Court*, 70 Cal.2d 97, 73 Cal. Rptr. 575, 447 P.2d 967 (1968), *with United States v. Cangiano*, 464 F.2d 320 (2d Cir. 1972); *Gold v. United States*, 378 F.2d 588 (9th Cir. 1967); and *Herbert v. State*, 10 Md.App. 279, 269 A.2d 430 (1970). *See* Comment, *Police*

*Bulletins and Private Searches*, 119 U.Pa.L.Rev. 163 (1970).

3. A similar problem is encountered in the substantive criminal law in determining whether an accused is liable as an aider and abettor. *See, e. g., United States v. Jackson*, 6 U.S.C. M.A. 193, 19 C.M.R. 319 (1955).

the search may be admitted into evidence in a trial by court-martial. If the Government seeks to use evidence obtained either directly or indirectly from a search conducted solely by foreign authorities, a showing by the prosecution that the search by foreign officials was lawful, applying the law of their sovereign shall be a prerequisite for its admission in evidence upon motion of the defense.[4]

Of course, this pronouncement was not required by the facts of the case because in *Jordan* (*id.* at 339):

> [t]he actions of the American officials in unlocking the accused's locker as well as photographing the stolen property demonstrated participation, even under *De-Leo* and the Manual, sufficient to require Fourth Amendment compliance. Viewed most favorably to the Government, the facts simply do not establish that, during the search, Air Force officials were merely bystanders or observers, "intent only on seeing the accused's rights were not violated."

Then, in dealing with a comparable issue in *United States v. Jones*, 6 M.J. 226 (C.M.A.1979), the Court rejected an attempt to apply the *Jordan* rule to the accused's interrogation by foreign police and concluded that "[t]he issue ... [was] whether the foreign police agent is a mere instrumentality of American authorities and, therefore, the interrogation is, in essence, an American interrogation." We added, "The presence of an American agent is insufficient to invoke the requirements of *Miranda* .... Furthermore, the furnishing of information

which results in the interrogation of an accused by foreign police agents is insufficient action to require *Miranda* warnings." *Id.* at 229.

Mil.R.Evid. 311(c)(3)—which, took effect after the trial of appellant's case—states:

> A search or seizure is not 'participated in' merely because a person is present at a search or seizure conducted in a foreign nation by officials of a foreign government or their agents, or because a person acted as an interpreter or took steps to mitigate damage to property or physical harm during the foreign search or seizure.

In explaining how this provision "clarifies" *Jordan*, the draftsmen's Analysis suggests that

> [t]he Court's intent in *Jordan* was to prevent American authorities from sidestepping Constitutional protections by using foreign personnel to conduct a search or seizure that would have been unlawful if conducted by Americans. That intention is safeguarded by the Rule, which applies the Rules and the Fourth Amendment when military personnel or their agents, conduct, instigate, or participate in a search or seizure. The Rule only clarifies the circumstances in which a United States official will be deemed to have participated in a foreign search or seizure. This follows dicta in *United States v. Jones*, 6 M.J. 226, 230 (C.M.A.1979) which would require an "element of causation," rather than mere presence.

■ Instead of merely clarifying *Jordan*, Mil.R.Evid. 311(c)(3) might be said to re-

---

4. Mil.R.Evid. 311(c) dispenses with *Jordan*'s requirement that it be shown that a foreign search was conducted in accord with the law of the foreign country involved. In that regard, the draftsmen's Analysis stated: "After careful analysis, a majority of the Committee concluded that that portion of the *Jordan* opinion which purported to require that such foreign searches be shown to have complied with foreign law is dicta and lacks any specific legal authority to support it. Further the Committee noted the fact that most foreign nations lack any law of search and seizure and that in some cases, *e. g.* Germany, such law as may exist is purely theoretical and not subject to determina-

tion. The *Jordan* requirement thus unduly complicates trial without supplying any protection to the accused." In the case at bar, trial defense counsel declined to contest the legality of the search under German law. Moreover, the potential destruction of evidence feared by the German customs police when they searched without seeking prior court authorization might well involve "exigent circumstances," which would even excuse the procurement of a search warrant under Fourth Amendment criteria. *Cf. United States v. Murray*, 12 M.J. 139 (C.M.A.1981); *United States v. Phinizy*, 12 M.J. 40 (C.M.A.1981).

write the rule proclaimed in *Jordan*. However, the Analysis correctly perceives that the basic purpose of *Jordan* was to avoid evasion of fourth amendment safeguards by use of foreign police officials as a means of accomplishing searches that would be invalid if carried out by American military authorities. In the case at bar the findings of the trial judge make clear that this evil was not present. The OSI did not attempt to use the German customs police as an "instrumentality" to perform a search that could not lawfully be performed under American authority. *Cf. United States v. Jones, supra.* Mohr's call to the German customs police was not intended to precipitate a search; indeed, the OSI presumed that the search had already taken place. Even though the call resulted in providing information to the Germans, the purpose of that call was quite different—namely, to obtain information for the OSI, who lacked notice that the Germans had not already made a search. Accordingly, since American agents were not present during the search and since the vice with which our precedents have been chiefly concerned was absent, *Jordan* does not prevent our upholding the trial judge's determination that the products of the German search were admissible in evidence.

Indeed, to apply the exclusionary rule in the case at hand would inflict on the Government a disproportionate penalty for acts that were innocent and done in good faith. Moreover, as the staff judge advocate pointed out in his thoughtful review:

Carrying the rule to this extreme, so as to render the evidence seized under such circumstances inadmissible at a trial by court-martial, could in the long run foreseeably tend to induce foreign authorities to maintain their own jurisdiction over cases based on their own searches and seizures, and thereby result in more American servicemen standing trial in foreign courts and serving time in foreign jails. If so, such an extension of American search and seizure requirements would do little to either accord the American serviceman greater protection under his constitutional guarantees or carry out DOD and Congressionally announced policy that American servicemen serving overseas should insofar as possible be tried in United States military courts, rather than foreign courts, for offenses committed on foreign soil.

Therefore, we are sure that in the case at hand furnishing information to the customs police—with no purpose to induce a German search—did not "instigate" the ensuing search, or constitute "participation" therein, within the contemplation of the 1969 Manual for Courts-Martial (*see* para. 152).

### IV

In the exercise of its broad supervisory authority over military justice, this Court sometimes has found it necessary to adopt a sweeping rule in order to extirpate a perceived evil. For example, early in our history a doctrine of "general prejudice" was utilized to enforce the prohibition against a "closed conference"[5] between the law officer and the court members with respect to sentence. This drastic measure was considered necessary because of the absence in military law of "a tradition of centuries standing that judges do not confer privately with juries." *United States v. Keith*, 1 U.S.C.M.A. 493, 496, 4 C.M.R. 85, 88 (1952). Likewise, frequent excessive delays by convening authorities in performing their appellate responsibilities convinced the Court that prejudice should be presumed if more than 90 days expired without completion of the initial appellate review. *Dunlap v. Convening Authority*, 23 U.S.C.M.A. 135, 48 C.M.R. 751 (1974). Then, in *Jordan*, a majority of the Court concluded that it was appropriate as a prophylactic measure to hold that presence of American officials should be deemed to constitute participation in a foreign search.

After several years the Court no longer found a need to invoke "general prejudice" in dealing with the problem of the "closed conference" between a law officer and court members. *United States v. Allbee*, 5

---

**5.** *See United States v. Allbee*, 5 U.S.C.M.A. 448, 450, 18 C.M.R. 72, 74 (1955).

U.S.C.M.A. 448, 450, 18 C.M.R. 72, 74 (1955). In *United States v. Banks*, 7 M.J. 92 (C.M. A.1979), a majority of the Court concluded that, since "convicted service persons now enjoy protections which had not been developed when *Dunlap* was decided," *id.* at 93, it would no longer be necessary to presume prejudice to an accused from the passage of more than 90 days before the convening authority acted on his case. Now we should decide whether the rule in *Jordan*—which equates presence at a search with participation in that search—has been overtaken by the passage of events.

In that connection, we observe that the practical effect of *Jordan* was to broaden the scope of the exclusionary rule. In so doing, the decision ran counter to the increasing disillusionment with the rule that has been displayed by the Supreme Court.[6] The Fifth Circuit has recently reexamined the exclusionary rule.[7] Likewise, *Jordan* is at odds with recent Supreme Court decisions that limit the opportunity for a defendant to derive benefit from police misconduct.[8] Moreover, in promulgating Mil. R.Evid. 311(c)(3), the President used his Article 36, UCMJ, 10 U.S.C. § 836, authority to register discontent with the *Jordan* rule that presence by itself constitutes participation.

■ Our survey of civilian precedents leads us to conclude that the fourth amendment does not require such a rule. Indeed, as explained in *United States v. DeLeo*, *supra*, there are reasons why the presence of American personnel during a foreign search should be viewed as more neutral than the presence of a Federal investigator at a search conducted by a State or local official or by a private person. Therefore, the rule of *Jordan* should no longer be applied—just as in other situations we sometimes have discontinued our use of a prophylactic rule.

Accordingly, in conformity with Mil.R. Evid. 311(c)(3), we shall no longer hold that in itself presence at a foreign search constitutes participation therein. Instead, in each case the presence of American officials must be examined to determine whether it had the benign purposes hypothesized by *DeLeo* or instead was part of a scheme to evade the fourth amendment, as feared by the majority in *Jordan*.

### V

The decision of the United States Air Force Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (concurring in the result):

I write not to defend this Court's decision in *United States v. Jordan*, 1 M.J. 334 (C.M. A.1976), but to explain it. The majority opinion correctly states that the latter part of the rule in *Jordan* is *dicta*,[1] and was so

---

6. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

7. *United States v. Williams*, 622 F.2d 830 (1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981) (court sitting *en banc* recognizes good-faith exception to the exclusionary rule); *see Report of a Federal Task Force on Violent Crimes* (1981) (recommending that the exclusionary rule be limited to cases of bad faith by the police). *See also Report of the Royal Commission on Criminal Procedure* (1981) (British rejection of exclusionary rule after evaluating American experience).

8. *Cf. United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *United States v. Payner*, *supra*.

1. *United States v. Jordan*, 1 M.J. 334, 338 (C.M. A.1976):

If the Government seeks to use evidence obtained either directly or indirectly from a search conducted solely by foreign authorities, a showing by the prosecution that the search by foreign officials was lawful, apply-

recognized by those who worked in the committee which compiled the Military Rules of Evidence. The then sitting judges of this Court gave their approval to the Rules through their representatives on the Military Rules of Evidence Committee and by their individual actions.

*United States v. Jordan, supra*, announced an exclusionary rule. *United States v. DeLeo*, 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954), announced an exclusionary rule.[2] Paragraph 152, Manual for Courts-Martial, United States, 1951, promulgated an exclusionary rule.[3] Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition),[4] promulgated

ing the law of their sovereign, shall be a prerequisite for its admission in evidence upon motion of the defense.

2. *United States v. DeLeo*, 5 U.S.C.M.A. 148, 155, 17 C.M.R. 148, 155 (1954) (emphasis added):

It is a well-established rule of Federal law that the Government may use evidence obtained through an illegal search effected by American state or by foreign police—*unless Federal agents participated to some recognizable extent therein.*

3. Paragraph 152, Manual for Courts-Martial, United States, 1951:

Evidence is inadmissible against the accused if it was obtained as a result of an unlawful search of his property conducted or instigated by persons acting under authority of the United States.

4. Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition):

Evidence is inadmissible against the accused: If it was obtained as a result of an unlawful search of the person or property of the accused conducted, instigated, or participated in by an official or agent of the United States, or any State thereof or political subdivision of either, who was acting in a Governmental capacity.

5. Mil.R.Evid. 311(c)(1):

an exclusionary rule, and Mil.R.Evid. 311(c)(1) promulgated an exclusionary rule.[5]

That other facet of *United States v. Jordan, supra*,[6] perceived by my Brothers as being harmful, was the addition of certainty to an already existing exclusionary rule. My Brothers cure this perceived harm with opinions that can only lead to uncertainty in the field. Any legal concept that is left to be decided *ad hoc* only at the appellate level is not a rule which can provide meaningful guidance to the trial bench or bar.[7]

I believe the facts of this case do not require exclusion of the evidence under *United States v. Jordan, supra*.

(c) *Nature of search or seizure.* A search or seizure is "unlawful" if it was conducted, instigated, or participated in by:

(1) *Military personnel.* Military personnel or their agents and was in violation of the Constitution of the United States as applied to members of the armed forces, an Act of Congress applicable to trials by court-martial that requires exclusion of evidence obtained in violation thereof, or rules 312–317.

6. *United States v. Jordan, supra* at 338:

We therefore hold that, for trials by court-martial commencing after the date of this opinion, whenever American officials are present at the scene of a foreign search or, even though not present, provide any information or assistance, directive or request, which sets in motion, aids, or otherwise furthers the objectives of a foreign search, the search must satisfy the Fourth Amendment as applied in the military community before fruits of the search may be admitted into evidence in a trial by court-martial.

Presence at the scene is not an issue in Morrison's case.

7. It appears to me that now the question for the trial bench and bar as to admissibility is, "How much is too much or how little is not enough?"