**UNITED STATES, Appellee,**

v.

**Joe Ann CLOW, Specialist Four, U.S. Army, Appellant.**

No. 54,297.
CM 446731.

U.S. Court of Military Appeals.

June 20, 1988.

For Appellant: *Captain David W. Sorensen* (argued); *Colonel Brooks B. La Grua, Lieutenant Colonel Paul J. Luedtke, Major Eric T. Franzen* (on brief); *Captain Bernard P. Ingold* and *Captain Keith W. Sickendick.*

For Appellee: *Captain Vito A. Clementi* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Captain Samuel J. Rob* (on brief); *Colonel James Kucera, Lieutenant Colonel*

*Adrian J. Gravelle, Captain Michael W. Hoadley.*

### Opinion of the Court

EVERETT, Chief Judge:

Specialist Four Joe Ann Clow was tried at Bremerhaven, Federal Republic of Germany, by a military judge sitting as a general court-martial. Contrary to her pleas, she was found guilty of larceny of mail items—13 video cassette tapes and an envelope containing collector stamps—in violation of Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934.[1] The military judge sentenced Specialist Clow to a dishonorable discharge, confinement for 1 year, total forfeitures, and reduction to the grade of Private E-1. Thereafter, the convening authority approved the sentence, and the Court of Military Review affirmed the findings and sentence in a short-form opinion. We granted review on this issue:

> WHETHER THE EVIDENCE OBTAINED DURING A WARRANTLESS SEARCH OF APPELLANT'S APARTMENT WAS ADMISSIBLE AS THE INDIVIDUAL CONSENTING TO THE SEARCH DID NOT HAVE AUTHORITY TO DO SO.

### I

On May 30, 1984, Craig Clow, appellant's husband, allowed Special Agent Michael I. Kelley of the Criminal Investigation Command (CID) and three German policemen to enter and search appellant's off-post apartment, where they seized nine video cassette tapes and an envelope containing about 205 collector stamps. Defense counsel moved to suppress this evidence on the ground that Mr. Clow lacked authority to consent to a search of his wife's residence.

The Government acknowledged that there was no warrant or authorization to search for these items but contended that this was a private search not subject to [the] Fourth Amendment exclusion and beyond that, Your Honor, the government would pose that Mr. Clow had standing to consent as he had access to the quarters, had lived there in the quarters and was not otherwise excluded therefrom and he could give a consent to search should you find that a private search did not occur.

Mr. Clow and CID Special Agent Michael I. Kelley appeared as government witnesses on the motion to suppress. According to Kelley's testimony, Mr. Clow had been in the hospital on May 30, 1984, and "had made a complaint to the MPs at the hospital that his wife had stolen some cassette tapes from the APO where she worked." The military police desk sergeant knew that recently $3,000.00 had been stolen from the "APO Registered Mail Section where ... [appellant] worked"; and "he put it together" and notified the CID of Mr. Clow's accusations, as well as of the fact that the Clows had been involved in "a domestic disturbance." Subsequently, a CID agent[2] went to the hospital to talk with Mr. Clow about the larceny and brought him back to the CID office. Enroute there, he gave this agent a verbal statement.

Subsequently, Special Agent Michael Kelley interviewed Mr. Clow at the CID office and "took a witness statement." Then he "asked him for a consent to search of the residence." According to Special Agent Kelley's testimony, Mr. Clow "granted his consent and was willing to assist the office ... [b]y taking us to the apartment." Before asking for the consent to search the apartment, Agent Kelley had already "established that" Mr. Clow "was in fact" appellant's husband; that he "had lived" at the apartment; "[a]nd that he had access" there. Kelley denied that he had

---

1. Appellant also had been charged with willfully disobeying "a lawful command from Captain Alan Dodson ... to comply with the CID request for handwriting exemplars and to make no attempt to disguise her handwriting ...." However, on this charge the military judge granted a defense motion for a finding of not guilty.

2. The agent was Christina Kelley, the wife of Special Agent Michael Kelley.

known that Mr. Clow "had not lived in" the apartment "for about 2 months."

After obtaining consent from Mr. Clow to search the apartment, Special Agent Kelley notified the staff judge advocate's office and was advised to contact the local German police to get a search warrant. According to Kelley, even though he already had obtained consent to the search, he felt that "it's always good to have a search authorization to back that up." The German police in Bremerhaven "gave ... a verbal search authorization," and German police accompanied Kelley and Mr. Clow to the apartment.[3] "Mr. Clow entered the apartment first"; three German policemen came next; and Kelley brought up the rear. Then, according to Kelley, "immediately without any direction given or any instruction given by anyone there," Mr. Clow walked "straight" "into the bedroom of Specialist Clow and went directly to a closet-like schrank and produced two bags which contained tapes." Then, "it only took a few seconds and he had had those tapes in his hand," and "he knew exactly what he was doing." The others were all in the living room when Mr. Clow retrieved the tapes from the "schrank"; and Mr. Clow came into the living room and said, "These are the tapes I told you about." At that point, the video cassette tapes were seized.

As to the bedroom where the schrank was located, Kelley

suspected it wasn't his room but I wasn't so. sure until I was there at the apartment. His actions were that type but again that's why I had the German Criminal Police there and he went right in and picked up the tapes.

Special Agent Kelley acknowledged that the schrank itself was not Mr. Clow's.

"[S]omewhere in the living room," Mr. Clow had found "some handwritten notes or listing of tapes by name" and "an envelope containing collector's stamps"[4]; but Kelley did not know the precise location where they had been. Kelley observed that "[t]he living room was a mess"; but Mr. Clow "seemed to know—he knew definitely where the stamps were and he seemed to know the approximate area of the other items seized."

Mr. Clow testified that on the morning of the same day when he had brought Special Agent Kelley to the apartment, he and appellant had a big fight; and neighbors had called both the German police and the military police. After arriving at the apartment, the military police had taken him to the hospital because "[s]omething was wrong with my arm." According to him:

A female CID agent approached me and she said are you aware—she asked me who I was. I told her. She told me who she was and showed me her badge and I said what's the problem my wife and I just had a fight.

\* \* \* \* \* \*

Then, I said to her what's the problem? What is CID—she said, "are you aware that there is $3,000.00 missing from the APO?" I said, "no I don't know anything about that" and she said well, "yeah, this is true and we suspect that your wife stole the money." The conversation carried on and she was asking me has my wife ever brought any mail home, have I ever seen any envelopes marked from the APO. I said, "no, I've never seen anything like that." The only thing that my wife has come home with since I've been here is video tapes. She said, "do

---

**3.** Despite this verbal authorization from German officials, the prosecutor apparently recognized that, having originated with military law-enforcement agents, the search was subject to American constitutional requirements. *Cf. United States v. Armstrong*, 9 M.J. 374 (C.M.A. 1980).

**4.** Agent Kelley stated that during his interview with Mr. Clow he had been told

that there were addresses of envelopes or notes or letters from other people at the residence and that he didn't know for sure whether they were there because he stated Specialist Clow would tear them up and was very meticulous in destroying any addresses and that was what he discovered in the apartment.

you mind letting me see your video tapes?" I said, "sure."

Mr. Clow also explained:

The female CID officer asked me all of these questions. Would I mind if they looked in the house and I said, "well, what would happen if I did?" She told me that if something did happen that it would look bad on me as far as whatever happened. *Anyway, so, I said, you know, I'll give you consent. You can go look in my house. It doesn't matter to me.*

(Emphasis added.)

According to Mr. Clow's account, when he, Special Agent Kelley, and the German policemen[5] went to the apartment, he "opened the door" with a key.

We entered the apartment all at the same time. They rushed in the room and started looking. I stood and watched

\* \* \* \* \* \*

The tapes weren't where they had initially been stored. They were missing. Special Agent Kelley asked me, "where are the tapes?" "Find the tapes." Those were his words.

Thereupon, Mr. Clow "looked around the house in several rooms," but he could not "find the tapes." Then, he "walked in her room—*in my wife's room.* I looked around. I opened the schrank and there were the tapes." (Emphasis added.) He then "turned to" the German policeman who was in the room with him and "said here is [sic] the tapes." According to him, Special Agent Kelley found the stamps "[i]n a drawer in the living room."

In describing his ties to the apartment, Mr. Clow testified that he and appellant had been married for approximately a year and a half.[6] After their marriage in the United States, she had been sent to Germany; and, as a civilian, he had joined her there in November of 1983. Appellant already had leased the apartment before he arrived in Germany, and she paid the rent

as well as the telephone and electric bills. They cohabited there "maybe about five or six months"—*i.e.,* from November 1983 to about March 1984.

During that time, however, he had not "jointly" occupied with appellant the bedroom in which the tapes were found. According to Mr. Clow, "It belong[ed] to my wife" and it was "her room." "Sometimes" the bedroom door would be locked, even though it was unlocked on the day he found the tapes in the schrank. The only time he had slept in the bedroom was on the November night when he first arrived in Germany. Mr. Clow made it clear that "[t]here was a separate room which belonged to me and my clothing was in that room" and that he had "slept on the couch" "[t]he whole time." As to the schrank in the bedroom, he averred that it was "the personal property of my wife's" and only her clothes were kept in it. The "schrank was kept locked," but the key was inserted "in the door"; and this had been the situation when the tapes were found.

Mr. Clow further testified that, when he moved out of the apartment and left his wife there, he stayed at another residence and "was living there" with another woman. He "considered" the new residence "to be" his "home"; and he had taken some of his clothes and tools with him and had told appellant that he "didn't care" what she did with those things he left in the apartment.

Despite having moved to another residence in March, Mr. Clow claimed that he had returned to the apartment "[m]aybe 10 or 11 times" before the search occurred in May. Every time he had used his key to obtain access. "Most of the time," however, appellant was unhappy about his "coming back"; and she had asked him, "[W]hy don't I take all of my things and live ... [at the other apartment] instead of bothering her all of the time?" According to Mr. Clow, appellant never specifically asked him to give her the apartment keys back; but he recalled, "Well, we were al-

---

**5.** These German policemen were referred to by Mr. Clow as "CRIPO"—apparently plainclothes German police agents.

**6.** At the time of trial, they were still married.

ways fighting and there was always all kind of words probably when she told me to either get out or something like that and don't come back." In any event, "[a] hundred percent of the time when I came there she was not there." Furthermore, Mr. Clow admitted that appellant had attempted "to get a separation agreement ... at the legal assistance office" and had tried to have him sent back to the United States ahead of schedule.

Finally, he testified that on the day before the seizure of the items occurred, he had gone to the apartment and taken a television set, a radio, and some video cassette tapes of movies and a video cassette recorder. The television set "was supposedly our TV"; and the video cassette tapes were taken from "[a] drawer in the house," and "[t]hey belonged to my wife." He had taken "them to the residence where I was staying at the time." According to Mr. Clow, he again returned to the apartment the next day about 2 o'clock in the morning "to get some of my things." At that time, he and appellant got into an altercation when he told her "something ... like I give up you win." Apparently, appellant had injured Mr. Clow's hand during this encounter; and the military police had taken him to the hospital, where he subsequently was interviewed by the CID about mail theft at the Bremerhaven Army Post Office.

In support of the motion to suppress the items seized from appellant's apartment, the defense first offered the stipulated testimony of First Sergeant Henry "[t]hat prior to the 17th day of May 1984, Specialist Clow had sought his assistance in having her husband sent home early." Appellant then testified that Mr. Clow had never paid any of the rent on the apartment—even after he had found a job; and he had not paid "any of the bills," which were all in her name. She was afraid of him because he physically and mentally abused her. "[I]t got so bad that he ... would just take my purse and take my keys and take my money and do what he wanted." Furthermore, he had an uncontrollable temper and took "it out on me or on the furniture or

whatever else is valuable. It's like to destroy things because he doesn't care."

Appellant testified that she had complained to the German police concerning her husband's behavior; but they had told her that "they can't do anything about it because what's yours is legally his." She also had gone to the office of the staff judge advocate and had attempted to initiate "some separation paperwork"; they had told her that she and her husband "would have to agree if ... [they] want certain things divided." However, he would not assent to the separation agreement. Finally, she had attempted to have military authorities send her husband back to the United States; but they could not do so "because he was non-command sponsored."

According to appellant, her husband had "permanently" left the apartment in March. He had taken "some of his things" and told her that she could do whatever she wanted to do with the things he left behind. He still had two sets of keys to the apartment, one to the outside front door and the other to the inside front door lock. When she told him that he "should hand me my keys over," her husband "really didn't make no statement behind it like he didn't want to, like he still wanted access to come into my apartment and to do anything he wanted to do when he felt like he wanted to ...." Appellant conceded that Mr. Clow had, in fact, come back to the apartment from time to time. *"He'd come back unexpectedly in the late hours of the night, anytime—anytime he felt like it and he would stay maybe for that night or a day and he'd leave the next day."* (Emphasis added.) He would sleep "[i]n the living room on the couch."

She also conceded that she had not changed the apartment door locks. However, she mentioned that on one occasion she had changed the locks to the inside door, but her husband had "kicked the door in and broke it open which cost over a thousand marks. So, it wouldn't have even made any difference if I had gotten the

locks changed." Appellant also testified that she had not changed the locks on the front door because she had "thought ... [her husband] had c[o]me to his senses" and finally had decided to leave her alone and start living his life without her. Furthermore, she was experiencing some financial problems and "really wasn't ... in a hurry to get any more debts on me and that would have cost a lot of money." Her bedroom door had a lock; but she had lost the key.

Appellant testified that on the day when the items were seized from her apartment, her husband had come earlier to the apartment (about 3:00 a.m.) and had started arguing. When he "tired of" this, "he eventually passed out on the couch." As she was getting ready to go to work later that morning, he got up and started arguing again and beating, slapping, and kicking her. "He snatched the" telephone out of the wall; and she

> tried to run upstairs to the neighbor's phone to call the MPs, the polizei or even get them to help me get him off of me. They were really used to it but they wouldn't come down and try to help me but they would call the MPs immediately and polizei but he wouldn't let me out of the door. He slammed the door and backed me up into the corner. I ended up in his bedroom.

She finally had been able to get out of the door and run "upstairs to tell the neighbors to call the MPs but they had already called the polizei and the MPs," who came to the apartment.

■ On the basis of the evidence before him, the military judge ruled that Mr. Clow had not conducted a private search and was acting as the agent of the law-enforcement authorities when he went back to the residence. However, the judge agreed with the Government that the evidence in question should not be suppressed because "in this case ... [Mr. Clow] did have authority to consent" to the search. This conclusion was reached because

he had sufficient connection with the residence by the fact that he did have the key and he kept going back and getting things that's items [sic] and leaving them and going back and forth that although your client did not like the fact that he was coming back he had not been barred from coming. Some of his items were still there. Whether he came back to argue or otherwise, he still was making use of the residence.... [H]e still had access to the apartment by the fact that his items were still there and that he was coming and going into that apartment and that he had retained the key and that no new lock had been placed on there.... So, I find that there was no American warrant but I do find that a person with authority to consent did consent and that in effect we have a consensual search in this case. I also find that it was or at least there is no evidence of it being illegal under German law and I have no motion to suppress it because it was illegal under German law and that isn't the issue that we have here. The issue was limited to whether we have a legal American search and I find we do in that sense of it being a lawful consent search by someone who had authority to consent....

The military judge stated that he had reached the conclusion that Mr. Clow had authority to consent to the search of the residence, even though appellant "was the sole owner of the apartment since she was paying the rent, that it was in her name, things of that nature," and despite the fact that Mr. Clow "had taken another residence." Furthermore, he found that the voluntariness of the consent "wasn't the issue that was raised" and that there was no question that Mr. Clow's consent was voluntary. Accordingly, he admitted the evidence on the ground that Mr. Clow validly had consented to the search and seizure.[7]

---

7. The only dispute at this level is whether Mr. Clow could validly consent to the search and seizure. The military judge properly rejected the Government's claim that the search of the apartment was "private" and therefore not within the purview of the Fourth Amendment.

## II

■ Appellant was convicted of stealing 13 videocassette tapes, of which only 9 were the subject of the defense motion to suppress. The other 4 had been taken from the apartment by Mr. Clow prior to the search and were delivered by him to the CID after the search had been performed. The absence of a motion to suppress these 4 tapes normally would waive any Fourth-Amendment objection to their admissibility.

■ Moreover, it is clear that in this case the defense failure to contest the reception of these 4 tapes in evidence does not pose any question as to the effective assistance of counsel. *Cf. Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Clearly, those tapes were admissible as the fruit of a private search by Mr. Clow—a search which had not been instigated by the CID and in which law-enforcement agents did not participate. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Morrison*, 12 M.J. 272, 275 (C.M.A.1982); *United States v. Volante*, 4 U.S.C.M.A. 689, 16 C.M.R. 263 (1954). Moreover, his delivery of these tapes to the CID after the search of the apartment had been performed was not tainted in any way by that search; instead, it resulted from the exercise of Mr. Clow's free will. *Cf. United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 81, 54 L.Ed.2d 207 (1978).

## III

■ Since the military judge properly refused to treat as private the search of appellant's apartment in which the nine tapes and the collector's stamps were seized, *cf. United States v. Armstrong*, 9 M.J. 374 (C.M.A.1980), the only question remaining for our consideration is whether this search was made pursuant to valid consent.

The starting point for our analysis must be an examination of the reasonable expectation of privacy of the person who is complaining about the search and seizure. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Certainly, anyone who personally consents to a search by the police does not retain any expectation of privacy with respect to the place or object that he has permitted them to search. Thus, consent has been repeatedly upheld as a valid basis for performing a search. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), where the Supreme Court observed:

> In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence.

412 U.S. at 227 (footnote omitted).

Moreover, under some circumstances, valid consent may be given by a third person who has a close contact with the place or property to be searched. *See, e.g., United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (defendant's mistress consented to search of bedroom they jointly occupied); *Schneckloth v. Bustamonte, supra* (consent to car search given by a passenger who was the brother of car owner); *Frazier v. Cupp*, 394 U.S. 731, 87 S.Ct. 1420, 22 L.Ed. 684 (1969) (joint users of a duffel bag).

Third-party consent is recognized by Mil. R.Evid. 314(e), Manual for Courts-Martial, United States, 1984, which provides that a third party "may grant consent to search property when the person exercises control over that property." According to the Drafters' Analysis, "the degree of control that an individual has over [the] property" is the determinative factor, and "whether an individual may grant consent to a search of property not his own is a matter to be determined on a case by case basis." The Analysis also points out, "It was the Committee's intent to restate current law in this provision and not to modify it in any degree." *See* p. A22–21, Manual, *supra*.

Under "current law" it seems clear that the validity of consent should not hinge on niceties of property law or on legal techni-

calities. *Cf. Katz v. United States, supra.* Thus, in *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), the Supreme Court ruled that a landlord's consent to a search could not bind the tenant, even if under the terms of the lease and under local property law the landlord was entitled to inspect the premises in order to assure that there had been no damage. Similarly, in *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Court held that a hotel clerk could not give valid consent to a police search of a guest's room, whatever might be the right of hotel employees to enter the room for such purposes as cleaning.[8] Moreover, *Stoner* seemed to reject a government contention that a search and seizure would be reasonable if law-enforcement officials had a reasonable basis to believe that the person giving the consent had authority to do so. "Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" *Id.* at 488, 84 S.Ct. at 892.

In *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Court recognized that, although some earlier decisions had left open the question, "more recent authority here clearly indicates that the consent of one who possesses *common authority* over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170, 94 S.Ct. at 993. Moreover, according to the Court, its recent opinions [9]

> at least make clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, *but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient*

> relationship to the premises or effects sought to be inspected.

*Id.* at 171, 94 S.Ct. at 993 (emphasis added.)

In a footnote to the foregoing quotation, the Court emphasized that authority for third-party consent

> is ... not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) ....

Rather, "common authority" is defined in that footnote as resting

> on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

In *Amos v. United States,* 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921), the Supreme Court left undecided the issue of whether a wife by reason of her marital status could give valid consent to the search of her husband's property. *See also Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Generally, the marital relationship standing alone has proved to be an insufficient basis for holding that one spouse's consent bound the other. *See, e.g., Silva v. State,* 344 So.2d

---

8. In *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the hotel manager's consent was effective as to a hotel room which the defendant had recently vacated.

9. Citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

559, 561 (Fla.1977).[10] On the other hand, arguments have been rejected that, because of the husband-wife testimonial privilege, one spouse is disqualified to give consent to a search of the other's property. *See State v. Rye*, 2 Wash.App. 920, 471 P.2d 96 (1970); *State v. Crevina*, 110 N.J. Super. 571, 266 A.2d 319 (1970).

Different conclusions have been reached in considering the effect of estrangement between spouses. Of course, where the spouse who is attacking the search previously had left the marital residence, the remaining spouse as an occupant of the residence is authorized to consent to the search. Where, however, the consenting spouse is the one who has left the marital residence, the outcome has depended largely upon the specific facts of the case.[11]

In *United States v. Crouthers*, 669 F.2d 635 (10th Cir.1982), where the search was held to be lawful, the defendant had given consent for FBI agents to search his apartment in connection with a robbery that had occurred on the same day. At the time, the agents found no incriminating evidence. The next day, Crouthers and his wife had flown from Denver to Chicago and then on to New York; but later, after returning from New York, the wife had contacted the FBI and advised that she suspected that her husband had been involved in the robbery. The agents then conducted another search of the apartment with her consent; and they uncovered evidence which connected the defendant to the robbery. At trial, the defense did not move to suppress any of the items that had been seized by the agents; and they were received in evidence. On appeal, Crouthers contended that failure to object constituted ineffective assistance of counsel.

In rejecting this contention, the Court noted that Mrs. Crouthers had instigated the search of the apartment but that about 2 weeks earlier "she had moved out of the

apartment" and "was living with her parents at the time of the search." Nonetheless, it was "apparent" to the Court "that Mrs. Crouthers had not abandoned her marriage or the apartment completely." In this connection, the Court mentioned that she had "accompanied her husband" about a week before she had given consent to the search; and, even after their return from New York, she had been "with her husband at the apartment." Moreover, she had "let" the agents "into the apartment"; and, according to the testimony of one of these agents, she "had a key to the apartment." In the Court's view, the evidence, viewed "in the light most favorable to the Government," authorized the inference "that at the time of the search Mrs. Crouthers had control over the apartment and was authorized to consent to the search." *Id.* at 643.

However, in *Bettuo v. Pelton*, 260 N.W.2d 423 (Iowa 1977), the court ruled that the defendant's estranged wife, who had moved out of the residence 6 months before, had no authority to consent to a search. In the Court's view, her consent would have been valid only if she had retained such joint access to, or control of, the residence for most purposes and had exercised such mutual use that her husband had assumed the risk that she would consent to a search. She had voluntarily surrendered the residence to her husband and was contributing nothing to the mortgage payments. The defendant was unaware that his wife had retained a key to their house. Since she had neither a reasonable expectation of mutual use of the residence nor the requisite control of the premises, her property interest in the premises did not of itself give her authority to consent to the search.

In *State v. Madrid*, 91 N.M. 375, 574 P.2d 594 (App.1978), defendant's wife had moved out of the marital residence with

---

**10.** A few courts treat differently a husband's right to consent to the search of his wife's property on the theory that he is the "head of the household"—a theory which in the wake of modern sensibilities seems anachronistic.

**11.** *See* Annotation, 31 A.L.R.2d 1078 (1953) and Supplements (1981 & 1987) for a collection of cases on third-party consent to search and seizure.

"most of her clothing" some 5 months before the search. *Id.* at 596. Nevertheless, the Court held that she had given valid consent to a warrantless search of the residence, where criminal items belonging to defendant had been found. The court stated that it did not base its decision on "common authority," if this term meant joint occupancy of the residence at the time of the search. However, in the court's view, *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, had established "that a valid consent to search may be obtained from one" who possesses "common authority *'or other sufficient relationship to the premises.'*" (Emphasis added.) Here a "sufficient relationship" existed, because defendant's "wife had a key" and "a right to occupy the premises" and because she had "use[d] the residence to some extent" by leaving on the premises her individual bedroom set and items in which she had a community-property interest. 574 P. 2d at 597.

When the spouses are not only estranged but also antagonistic and hostile, courts have disagreed as to the validity of the consent to a search. In *State v. Gonzalez-Valle,* 385 So.2d 681 (Fla.App.1980), upholding suppression of the evidence, the consenting "wife wanted her husband arrested" because of their "marital difficulties" and because of her anger and jealousy over his "affair with another woman." Since the wife was motivated by "spite" and had intended "to harm" her husband, she "had no right to waive her husband's protection against unreasonable searches and seizures any more than any other person would have had." *Id.* at 682.

However, in *Commonwealth v. Martin,* 358 Mass. 282, 264 N.E.2d 366 (1970), the existence of an amicable relationship between the spouses was considered immaterial in determining the effect of a spouse's consent to search a marital residence. The Court concluded that, if both spouses are living in the residence, their "equal authori-

ty" to consent to a search "does not lapse and revive with the lapse and revival of amicable relations between the spouses." *Id.* at 370.

Even when a spouse validly consents to a warrantless search of the marital residence, some courts have indicated that the consent may be ineffective for a particular room or container as to which, "by agreement or understanding," the consenting spouse does "not have access." *See Commonwealth v. Sebastian,* 500 S.W.2d 417, 419 (Ky.1973) (holding this exception not applicable to utility room just off kitchen). *See also State v. Middaugh,* 12 Or.App. 589, 507 P.2d 42, 45 (1973) (where the court stated that it "might recognize the 'exclusive use'" exception if "the exclusive user's expectation of privacy was both subjectively and objectively reasonable," but held that a kit on an open shelf did not indicate such exclusivity).

However, in *State v. Gillespie,* 18 Wash. App. 313, 569 P.2d 1174, 1176 (1977), the contention was rejected that "joint dominion and control of a husband and wife over the" marital residence did not "extend to a nonconsenting spouse's personal effects" or to the areas "kept for the exclusive use of" that spouse. The court added that, in any event, it would not adopt such an "exclusive use" rule where the husband and wife were "living together" and where the search was of "an ordinary item of ... wearing apparel"—a field jacket—which the defendant had "left hanging in" a closet to which both spouses had access.[12]

## IV

About 3 months before the search occurred, Mr. Clow had moved out of the apartment into another residence, where he was staying with another woman. However, he returned on some ten or eleven occasions; and he had full and unhampered access to the apartment because he had his

---

12. In *United States v. Mathis,* 16 U.S.C.M.A. 522, 524, 37 C.M.R. 142, 144 (1967), the Court stated that a host cannot allow police officers to have "access to any place personal to the accused, such as a closet or chest for his clothing and effects." However, no marital relationship was involved.

own keys. Indeed, according to his testimony, his wife had never "specifically" asked him to return the keys.

Appellant testified that, when she asked for her apartment keys, Mr. Clow did not respond because "he still wanted access to come into my apartment *and do anything he wanted to do when he felt like he wanted to. ...*" Obviously, his retention of access was complete, because *"[h]e'd come back unexpectedly in the late hours of the night, anytime—anytime he felt like it and he would stay maybe for that night or a day and he'd leave the next day."* (Emphasis added.) Indeed, earlier on the day of the search, Mr. Clow had entered the apartment at 3:00 a.m., started an argument with appellant, and slept for several hours—even though appellant claimed that she did not want him to be there.[13] Under our interpretation of the precedents, Mr. Clow's control over the apartment was sufficient to enable him to give valid consent to its entry by police officials for the purpose of a search.

■ Furthermore, we believe that this consent permitted search not only of the living room, where the collector's stamps were found, but also of the bedroom, where the nine video cassettes were discovered. Admittedly, Mr. Clow had never made much use of this bedroom. He testified that the bedroom was "my wife's room"; that "it belonged to my wife"; and that he had slept on the couch in the living room during the months he had resided in the apartment. He probably had slept only once in the bedroom—this occasion being when he first came to Germany some 7 months before the search took place. According to Mr. Clow, sometimes the door to the bedroom would be locked, although the bedroom door key had been lost.

However, even if we were to adopt the "exclusive use" doctrine, it would not apply here. Appellant's failure to protect her bedroom with a lock, even though Mr. Clow

entered the apartment at odd times of the day and night, is inconsistent with any contention that she enjoyed "exclusive use" of the bedroom. Her leaving the door unlocked demonstrates that appellant had no reasonable expectation that her husband would not enter her bedroom at any time; and the absence of any such expectation signifies that he could validly consent to a search of the bedroom by the police.

Likewise, the contents of the schrank would have a greater claim to judicial protection if appellant had better displayed an expectation of privacy with respect thereto. Leaving a key in the doorlock of the schrank without even turning that key to lock the door cannot be reconciled with any reasonable expectation that Mr. Clow have no access to the contents of the schrank.

■ Indeed, absent a clear showing that one spouse has "exclusive use" of some area within the marital residence or of some desk, bureau, cupboard, or other piece of furniture located therein—a situation as to which we reserve judgment—a spouse's access to the marital residence should be treated as access to all parts of that residence and to the contents of any furniture or containers located there. We do not believe that the Fourth Amendment requires that fine distinctions be drawn on the basis of how the husband and wife choose to allocate space or furniture within their home.

■ In a different context we have ruled that—until a married couple has been legally separated or divorced—disharmony in their marital relationship is immaterial. *United States v. Tipton*, 23 M.J. 338 (C.M. A.1987). Similarly, here it also is immaterial whether Mr. Clow's motive for consenting to the search was spite, self-preservation, or something else. His ability to give valid consent to a search did not derive from his wife, but instead it stemmed from

---

**13.** His control of the premises was also demonstrated by his taking a television set, a radio, and some video cassettes from the apartment before the search occurred. Moreover, previously he had left some of his clothing at the residence, and he had returned "to get some of his things" on the morning before the search.

his own "relationship to the premises." *See* 415 U.S. at 171, 94 S.Ct. at 993.

## V

■ Even though Mr. Clow had authority to consent to the search, the doctrine of "apparent authority" also supports the search's validity. A wife who allows her estranged husband to retain a key to her apartment is creating "apparent authority" on his part, not only to enter himself but also to allow the police to enter for purposes of a search. If the police reasonably rely thereon,[14] the fruits of the search are admissible.

■ We recognize, of course, the Supreme Court inveighed in *Stoner* against "unrealistic doctrines of 'apparent authority,' " *see* 376 U.S. at 488, 84 S.Ct. at 892. However, *Katz* teaches us that the Fourth Amendment protects only reasonable expectations of privacy; and someone whose actions have created the appearance that another person is authorized to consent to a search cannot properly assert an expectation of privacy when the police act in reasonable reliance on that "apparent authority." Indeed, when, as here, law-enforcement agents seem to have reasonably relied on the husband's apparent authority, there is no occasion to invoke the exclusionary rule—which is directed in large part to deterring *unreasonable* searches and seizures by the police.[15]

## VI

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN concurs.

COX, Judge (concurring in the result):

To resolve this case, I do not need to decide whether appellant's estranged husband actually exercised sufficient control over her off-post German apartment to give a valid consent under Mil.R.Evid. 314(e).* The reality is that the Criminal Investigation Command agents thought they had a good consent; they consulted with a judge advocate who advised them to coordinate with the German police; and they also obtained a valid search authorization from the German sovereign.

Admittedly, it might have been preferable to advise the agents to obtain a search authorization from the appropriate military judge, military magistrate, or responsible commander as well. *See* Mil.R.Evid. 315; paras. 2–1(c) and 2–2, Army Regulation 190–22 (Jan. 1, 1983); *United States v. Bunkley*, 12 M.J. 240 (C.M.A.1982). Based upon the information appellant's husband provided, there was overwhelming probable cause to authorize the search of appellant's off-base residence.

There is no indication whatsoever that American officials were using the host-nation officials as "part of a scheme to evade the fourth amendment." *United States v. Morrison*, 12 M.J. 272, 279 (C.M.A.1982). There is also no question in my mind that under the facts and circumstances in this case, exclusion of this evidence would have been inappropriate: This was not an "unreasonable" search.

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted,

14. If the police are aware that the husband is motivated by hostility towards his wife, then they probably cannot rely on his "apparent authority" to consent to the search; but they can nonetheless rely on any authority he may have by reason of his own "relationship to the premises." *See* 415 U.S. at 171, 94 S.Ct. at 993.

15. *See, e.g., United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

* Eisenberg, *Hell Hath No Fury Like ... A Hostile Third Party Granting Consent to Search,* in The Army Lawyer 1 (May 1979).

the justification for initiating it, and the place in which it is conducted. *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed. 2d 447 (1979). *See Murray v. Haldeman,* 16 M.J. 74, 81 (C.M. A.1983).

I would uphold this search because it did not implicate the prohibitions of the Fourth Amendment. In fact, this search of a dwelling house on foreign soil—accomplished with police officials having law-enforcement authority over that soil, pursuant to the laws governing that foreign soil, and in accordance with international treaties—might never implicate the Fourth Amendment.