*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS
Appellate Military Judges

————————————

**UNITED STATES**
Appellant

**v.**

**Alexander M. TAYLOR**
Major, U.S. Marine Corps
Appellee

**No. 201900242**

Decided: 30 April 2020

Appeal by the United States Pursuant to Article 62, UCMJ

Military Judge:
Jeffrey V. Munoz

Arraignment: 7 March 2019 by a general court-martial convened at Marine Corps Base Camp Pendleton, California.

For Appellant:
*Major Clayton L. Wiggins, USMC*
*Lieutenant Commander Timothy C. Ceder, JAGC, USN*

For Appellee:
*Major Anthony M. Grzincic, USMC*

Senior Judge TANG delivered the opinion of the Court, in which Judges LAWRENCE and STEPHENS joined.

————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

TANG, Senior Judge:

This is an interlocutory appeal taken by the Government under Article 62, Uniform Code of Military Justice [UCMJ].[1] Following a pretrial hearing, the military judge granted a Defense motion to suppress evidence resulting from the searches of 12 of Appellee's electronic devices. We are asked to decide whether we have jurisdiction over this appeal and, if so, whether the military judge abused his discretion by suppressing this evidence. We conclude that we have jurisdiction and that the military judge did not abuse his discretion. We therefore deny the Government's appeal.

## I. BACKGROUND

Appellee married Ms. Lisa Yankee[2] in 2011. Ms. Yankee had previously been married to another man with whom she shared two children: the alleged victim and the alleged victim's younger brother. Ms. Yankee and her ex-husband had an acrimonious divorce. Throughout Ms. Yankee's marriage to Appellee, there were many back-and-forth child custody disputes relating to the alleged victim and her younger brother. Personnel from various state agencies often interacted with the children to determine whether they felt comfortable in their two homes—they always said they did and that they wanted to continue living with both parents' families. The children disclaimed the existence of any abuse in either household. Ms. Yankee ultimately gained custody of the children in 2015, though custody continued to swap over the years based on various allegations.

On Valentine's Day 2016, while the children were with their father and step-mother, the children's father emailed Ms. Yankee that he would not allow their children to return home to her because the alleged victim told him that Appellee sexually abused her from 2014 to 2016. During the dates of abuse alleged, the victim would have been between the ages of seven and nine years old. Ms. Yankee initially did not believe the alleged victim because

---

[1] 10 U.S.C. § 862 (2019).

[2] In this opinion, we have replaced all names of third parties with pseudonyms.

her daughter had told lies before, and Ms. Yankee told law enforcement officers as much.

For Appellee, this allegation was the last straw. After five years of being caught up in Ms. Yankee and her ex-husband's child custody disputes, he had had enough.[3] Appellee moved out and, soon afterward, he told Ms. Yankee he wanted a divorce. Ms. Yankee told him, "I'll take you for everything you have," and "I will destroy you."[4] Soon after Appellee moved out, Ms. Yankee determined she now believed her daughter "100 percent," and eventually Ms. Yankee's son also alleged Appellee touched him inappropriately. Ms. Yankee relayed these allegations to law enforcement officials, eventually additionally claiming he had: (1) sexually assaulted her throughout their marriage; (2) sexually assaulted another man's girlfriend; (3) searched for barely-legal pornography; (4) fraternized and committed adultery; and (5) sent nude photographs to a 16-year-old girl.

In November 2016, after the civilian authorities declined to prosecute Appellee, the Naval Criminal Investigative Service [NCIS] took over as lead investigative agency. The record does not account for what happened between November 2016 and May 2018 when the investigation was apparently resumed. However, during that time period, Ms. Yankee and Appellee's divorce was finalized. By May 2018, when NCIS agents first met with Ms. Yankee, she was living elsewhere, told them she had Appellee's electronic devices and media, and a few days later gave them 12 items of electronic media that she said belonged to Appellee. The agents then held those items without taking any further action for nearly six months, never seeking a Command Authorization for Search and Seizure or a search warrant, and never asking Appellee for consent to search them.

In October 2018, Appellee was charged with rape of a child, charging that he digitally penetrated the alleged victim's vulva, and three specifications of sexual abuse of a child, charging that he touched the alleged victim's breasts, genitalia, and buttocks with the intent of gratifying his sexual desires. The offenses are alleged to have occurred between 1 January 2014 and 7 February 2016. In November 2018, after NCIS had had custody of the 12 items of media for several months, and after an Article 32 hearing had been held in Appellee's case, agents asked Ms. Yankee to consent to a search of the items

---

[3] *See* Appellate Exhibit [App. Ex.] XIII at 1 (Declaration of Appellee, submitted as an enclosure to the Defense Motion to Suppress Evidence).

[4] Record at 415.

she said belonged to Appellee. Ms. Yankee agreed and signed a permissive authorization for search and seizure [PASS] granting her consent to search a specific list of items.[5]

The Government found evidence on three of the devices, which it believes corroborates the alleged victim's allegations. The Defense moved to suppress all 12 items and the results of the search of those items. The military judge granted the Defense motion, issuing findings of fact and conclusions of law in a written ruling. The Government appeals the military judge's ruling pursuant to Article 62, UCMJ.

## II. JURISDICTION UNDER ARTICLE 62

As an initial matter, pointing to the military judge's expression of doubt as to whether any of the evidence at issue would be admissible at trial, Appellee argues this Court lacks jurisdiction to consider the Government's appeal because the suppressed evidence is not substantial proof of a fact material in the proceeding.[6] We construe our narrow jurisdictional grant under Article 62 strictly.[7] Nevertheless, it is this Court, not the Government, which ultimately decides whether we have jurisdiction to hear this appeal.[8]

Here, the Government contends that substantial proof of a material fact is contained on three items of media:

(1) an iMicro brand hard drive held together with purple tape [purple-taped drive], named "Time Machine Backups";[9]

(2) a 500GB Western Digital brand hard drive [Western Digital drive]; and

(3) a 2GB MicroSD memory card [memory card].[10]

---

[5] The list was not included in the record, and there are conflicting references to the items seized; however, we assume for purposes of this appeal that all 12 items of media at issue here are on that list.

[6] *See* 10 U.S.C. § 862(a)(1)(B) (2019).

[7] *Clinton v. Goldsmith*, 526 U.S. 529, 535 (1999).

[8] *See United States v. Jacobsen*, 77 M.J. 81, 86 (C.A.A.F. 2017).

[9] App. Ex. XI at 29.

[10] Because the Government does not contend that any evidence on the remaining nine devices constitutes proof of a material fact, we decline to consider the Government's appeal as it relates to those other devices.

From the forensic search of these three items, the Government has provided notice under Military Rules of Evidence [MRE] 404(b) and 414[11] of its intention to offer:

(1) 20 photos and one video of a "nude" female child—which *could* be the alleged victim—and a nude boy.[12]

(2) 42 thumbnail images of "suspected" child pornography.[13]

(3) Videos and numerous web artifacts[14] referencing teens, including six videos purporting to show teenage females, 25 web artifacts, including searches referencing teen torture and teen pornography.[15]

(4) A document that contains a story about a stepfather sexually interested in his stepdaughter.[16]

(5) "Web artifacts related to: child torture, do-fantasy (sex story),[17] and BDSM Library 'Bella and the Beast'."[18]

---

[11] Military Rule of Evidence 414 governs the admissibility of evidence of *offenses* of child molestation in cases in which an accused is charged with an offense of child molestation. Appellee is charged with an offense of child molestation. However, as described below, not all classes of the proffered evidence likely constitute other alleged *offenses* of child molestation by Appellee within the meaning of Military Rule of Evidence 414(d)(2). *See United States v. Yammine,* 69 M.J. 70 (C.A.A.F. 2010) (interpreting a prior version of MRE 414). Nevertheless, this Court will consider that the Government intends to offer the evidence under Military Rule of Evidence 404(b).

[12] App. Ex. X at 76, 80. Twenty images were from the purple-taped drive; 18 of apparently the same images and one video were on memory card. However, the Government omitted reference to the nude young boy when referring to the items on the memory card. Not all of the images were unique.

[13] *Id.*

[14] This term was not defined in the forensic examination report, nor did the Government define it in its MRE 404(b) or 414 filings. We understand this term to refer to forensic evidence of a user's internet browsing history.

[15] App. Ex. X at 76, 80.

[16] *Id.* at 76. The Government only cited MRE 404(b) in support of the admissibility of this evidence. The type of document was not specified; the forensic report merely noted that a "document was located containing what appears to be a story of a stepfather sexually interested in his stepdaughter," with no further explanation. App. Ex. XI at 30.

[17] The Government did not explain what this meant.

In its written notice of appeal under Rule for Courts-Martial [R.C.M.] 908, the Government characterized the suppressed evidence as "verified and suspected child pornography (seven known series), a comic strip depicting a step-father raping his step daughter, a text document entitled 'Bella and the Beast' that contains a graphic description of the rape of a 13 year old girl, and search terms referencing teen torture and teen pornography."[19]

The Government contends this evidence proves Appellee's "motive and intent to sexually exploit children."[20] The Government further contends this evidence is "particularly important" in this case because "there was no forensic analysis of the crime scene, no forensic interview of the [alleged] Victim, and several years have passed since the initial report."[21] Therefore, the Government urges this evidence is "substantial proof in this case" because it constitutes the only sources of possible corroborating evidence to the alleged victim's otherwise uncorroborated account.[22]

The Defense retained the services of a digital forensic examiner employed by the DoD Cyber Crime Center. This expert has participated in 140 forensic examinations and has testified as an expert in 16 courts-martial. He reviewed a forensic duplicate of all 12 devices Ms. Yankee turned over to NCIS. He provided a written declaration attesting that:

(1) No file on any item of media was apparently accessed, created, or downloaded any later than July 2013.[23]

(2) There was no evidence Appellee viewed any of the underlying images of suspected child pornography because the only files present were thumbnail, or "thumbs.db," files.[24] He opined that Appellee "almost certainly had no

---

[18] App. Ex. X at 76. The Government only cited MRE 404(b) in support of the admissibility of this evidence. The Government argued the title of the document was similar to a nickname attributed to the alleged victim.

[19] App. Ex. XXI at 1.

[20] Appellant's Reply Brief of 9 Dec 19 at 1.

[21] *Id.* at 3. According to Ms. Yankee, there was also no physical examination of the alleged victim.

[22] *Id.*

[23] The expert noted the date accuracy is contingent upon the date accuracy of the attached computer clock, which he could not verify.

[24] The expert believed the thumbs.db files were generated when an unknown user of a personal computer (not an Apple Macintosh computer [Mac], which is the only computer Appellee was known to own) displayed a folder of images in thumbnail

idea what was in the thumbs.db or that it was even there and, even if he knew it was there, he couldn't access it."[25]

(3) The six videos the Government stated were of "apparent" teenagers constituted six of 480 videos that were in a folder that was "mass copied" around 23:00 on 2 October 2009, all at the same time from a drive that had received files from an unknown source computer.[26] This was the same time the thumbs.db files were transferred. There was no evidence Appellee ever "searched for or even viewed" those files.[27]

(4) Although web searches were conducted for "teen + torture," on Google, Google images, and Google video, the unknown user then searched "teenager+tortured+cops+found" on Google and finally searched for "child+electric+torture+cops+found" and also "minutechild+electric+tortured+cops+found" on an Apple Macintosh [Mac] computer. This suggested the user was possibly searching for a news article rather than child pornography.

(5) "The pictures of the [nude] boy and girl. . . do not appear to constitute child pornography. The pictures appear to be bathtub-type pictures commonly taken by parents of their children."[28] Additionally, the photos likely belonged to Ms. Yankee.

The military judge found, and Appellee argued in his brief to this Court, that there is not a high likelihood that this evidence will be admitted at trial.[29] For this reason, Appellee contends it is not substantial evidence of a

---

view; deleted the underlying images; conducted a bulk transfer of files to removable media; later hooked that removable media up to Appellee's Mac; then Appellee's Mac was backed up to the purple-taped drive using the Time Machine program. All actions could happen without Appellee's knowledge or ability to see the contents of the thumbs.db images.

[25] App. Ex. XII at 9. The Government did not present any evidence to contradict this opinion.

[26] *Id*. at 8.

[27] *Id*.

[28] *Id*. at 5. "[T]he most identifiable person possessing these photos is the mother, [Ms. Yankee]. The pictures are duplicated across all three devices in question. . . . The only device on which the pictures of the children appeared that had a clear indicator of ownership, was the Western Digital. That hard drive is labeled [with Ms. Yankee's first name] and the pictures of the children were found under a folder" labeled with Ms. Yankee's first name and the word "pics." *Id*.

[29] The military judge wrote that the Government did not even know whether the nude child depicted was the alleged victim; the evidence tying Appellee to any child

fact material to the proceeding. Citing *United States v. Wuterich*,[30] the Government argues our "inquiry concerns the impact of the ruling on the pool of potential evidence, not whether there has been a formal ruling on admissibility."[31]

We are asked to determine whether we must take into account the likelihood of admissibility of the evidence when determining whether the suppressed evidence is proof of a material fact. In *Wuterich,* the Court of Appeals for the Armed Forces [CAAF] considered several appeals resulting from a military judge's action in granting a motion to quash a Government subpoena for outtakes of Staff Sergeant Wuterich's videotaped interview, portions of which aired on the CBS News program "60 Minutes." Wuterich argued the Government could not appeal the ruling under Article 62, UCMJ, because "the prosecution [had] not demonstrated that the outtakes [the prosecution sought] contain any relevant, admissible evidence."[32] He argued, because the Government had not seen the withheld outtakes, any "assertions as to what might be contained in [them] . . . were mere speculation" which, furthermore, were cumulative of other sources of Wuterich's statements.[33] The CAAF held that the "question of whether the material in the outtakes is cumulative goes to the merits of the ruling by the military judge, not whether that ruling is appealable."[34] The court wrote:

> In the present case, the military judge ruled that the evidence requested in the subpoena was cumulative with the evidence otherwise available to the prosecution. In so doing, he focused specifically on the pool of potential evidence that would be admissible at the court-martial. As such, his decision to quash the subpoena was appealable under Article 62, UCMJ, because it had a direct effect on whether the outtakes would be excluded from consideration at the court-martial.[35]

---

pornography images was "weak," possibly not relevant, and may be excluded under MRE 403 balancing. App. Ex. XXIII at 18.

[30] 67 M.J. 69 (C.A.A.F. 2008).

[31] Appellant's Reply Brief at 3 (quoting *Wuterich,* 67 M.J. at 73).

[32] *Wuterich*, 67 M.J. at 75.

[33] *Id.*

[34] *Id.* at 76.

[35] *Id.* at 77 (citation omitted).

We find this logic to be controlling. Although the evidence may ultimately never be admitted at trial on other grounds, such as Military Rule of Evidence 403, the military judge's ruling nonetheless excluded this entire class of evidence from consideration and shrank the potential pool of evidence available to the Government. Notwithstanding the likelihood that the military judge will not admit this evidence at trial, we find we have jurisdiction to hear the appeal as it relates to the three items of media from which the Government intends to offer evidence.

## III. Review of Military Judge's Ruling

### A. The Ruling

The military judge issued findings of fact and conclusions of law in a ruling in which he concluded that the Government "ha[d] failed to sustain its burden to demonstrate that there was 'lawful consent' by clear and convincing evidence to search" the devices.[36] In drafting his findings of fact, he stated that he "considered all legal and competent evidence presented by the parties, reasonable inferences to be drawn from the evidence, allied papers and documents" and that he had "resolved all issues of credibility."[37] He granted the Defense motion in whole.

The military judge found that Appellee had a reasonable expectation of privacy in the 12 devices and that he did not abandon them. Rather, he left the devices in his home with the expectation of reclaiming his property later. Ms. Yankee repeatedly prevented his agents from retrieving his property, then she took most of his personal property when she left, leaving him "maggots, rotted and decaying food, multiple trash bags, dozens of cigarette butts . . . , seemingly sliced or vandalized furniture," but little else.[38] Because Appellee did not abandon the property, the Government had to prove Ms. Yankee could consent to the search.

The military judge then held that Ms. Yankee could not provide valid consent to search Appellee's electronic media. In so holding, he detailed Ms. Yankee's relationship to the electronic media in light of binding precedent in *United States v. Matlock*,[39] *United States v. Clow*,[40] and *Frazier v. Cupp*,[41]

---

[36] App. Ex. XXIII at 19.

[37] *Id.* at 2.

[38] *Id.* at 5 (finding of fact q.).

[39] 415 U.S. 164 (1974).

which define when a third party with shared access, "common authority" or "other sufficient relationship" can lawfully consent to a search. He found that she could not consent because: (1) she did not own the devices, having repeatedly stated they belonged to Appellee;[42] (2) she did not lawfully possess the devices, having wrongfully impeded Appellee's agents from retrieving Appellee's property, then impermissibly removing the items from the home and failing to return them; [43] and (3) Appellee did not assume the risk that Ms. Yankee would consent to a search of the items she wrongfully withheld.[44] He ruled that she did not lawfully have "common authority," access, or control over the devices.

The military judge further held that Ms. Yankee lacked apparent authority to consent. He found that it was not reasonable for NCIS special agents to believe she could consent because they knew: (1) Ms. Yankee said the devices belonged to Appellee, not her; (2) the couple was divorced; (3) the couple's divorce was so "acrimonious" that Ms. Yankee had thrown Appellee's uniforms on the lawn when he sought their return; (4) Appellee had left the marital residence over two years before Ms. Yankee gave the devices to NCIS then months later consented to the search; and (5) Ms. Yankee prevented Appellee (and by extension, his surrogates) from retrieving his property by changing the locks.[45] Because the NCIS agents knew of Ms. Yankee's hostility toward Appellee, it was "*completely unreasonable*" to rely on her purported consent.[46]

Finding that Ms. Yankee could not provide actual or apparent consent, the military judge concluded the warrantless search was unlawful. The military judge further found, pursuant to MRE 311(a) that exclusion of the evidence would result in appreciable deterrence of future unlawful searches and seizures and the benefits of such deterrence outweigh the costs to the justice system. In weighing these interests, he noted that NCIS agents had been investigating the case for three-and-a-half years and that they made no

---

[40] 26 M.J. 176 (C.M.A. 1988).

[41] 394 U.S. 731 (1969).

[42] App. Ex. XXIII at 10.

[43] *Id.* at 11-12.

[44] *Id.* at 12.

[45] *Id.* at 15-16.

[46] *Id.* at 16 (emphasis in original).

effort to search the items of digital media for 165 days, never attempting to obtain a warrant or command authorization for search and seizure. He wrote, "There is a very strong implication in the failure to seek a [command authorization for search and seizure] that NCIS knew they did not have probable cause to search the 12 devices."[47] He next noted a "willful blindness wherein NCIS 'deliberately shield[ed] themselves from clear evidence of critical facts that are strongly suggested by the circumstances'" when it ignored facts that should have made it apparent that Ms. Yankee could not consent to the search.[48] Balancing these facts against the "questionable" admissibility of the evidence, which is not the "main evidence" of guilt, and NCIS's delay in reviewing the evidence, the military judge found the MRE 311(a) test weighed in favor of exclusion.[49] He also quickly rejected the Government's arguments relating to good faith and inevitable discovery and suppressed the evidence.

## B. Standard of Review Under Article 62 and the Government's Challenge

In this appeal, we may act only with respect to matters of law.[50] We are bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous, and we may not find facts in addition to those found by the military judge.[51] We review a military judge's ruling on a motion to suppress for abuse of discretion.[52] We review fact-finding under the clearly-erroneous standard and conclusions of law under a de novo standard.[53] It is an abuse of discretion if the military judge: (1) "predicates his ruling on findings of fact that are not supported by the evidence"; (2) "uses incorrect legal principles"; (3) "applies correct legal principles to the facts in a way that is clearly unreasonable"; or (4) "fails to

---

[47] *Id.* at 17.

[48] *Id.* (alteration in original) (quoting *Glob.-Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 766 (2011)).

[49] *Id.* at 18.

[50] Art. 62(b), UCMJ; Rule for Courts-Martial 908(c)(2).

[51] *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004).

[52] *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011).

[53] *Id.* (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)).

consider important facts."[54] It may also be an abuse of discretion if the "military judge's decision on the issue . . . is outside the range of choices reasonably arising from the applicable facts and the law."[55] The abuse of discretion standard calls "for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'"[56] We "consider the evidence in the light most favorable to the prevailing party."[57]

Here, the Government does not challenge the military judge's findings of fact, but instead argues the military judge abused his discretion by failing to take crucial facts into account and misapplying the law. Specifically, Appellant claims the military judge abused his discretion by:

(1) Failing to analyze Ms. Yankee's "joint use" of the devices and instead focusing on Appellee's purported ownership as dispositive;[58]

(2) Failing to reconcile critical facts by failing "to analyze Ms. Yankee's access and control of the three devices" when he concluded that the devices were "sole and separate property" of Appellee;[59]

(3) Misapplying the law when he failed to analyze Ms. Yankee's authority to consent based on an "other sufficient relationship" as outlined in *United States v. Matlock*;[60]

(4) Failing to mention or reconcile critical facts, including that: Ms. Yankee had used the devices; the devices were not password protected or stored in "any particular place" in the house; when Ms. Yankee moved out she took the items she "considered hers, shared property, or things having 'something to do with' her children"; the forensic analysis "corroborated Ms. Yankee's testimony of her use of the devices"; and the Defense expert

---

[54] *United States v. Commisso,* 76 M.J. 315, 321 (C.A.A.F. 2017) (citing *United States v. Ellis,* 68 M.J. 341, 344 (C.A.A.F. 2010)); *United States v. Solomon,* 72 M.J. 176, 180-81 (C.A.A.F. 2013)).

[55] *United States v. Frost,* 79 M.J. 104, 109 (C.A.A.F. 2019) (quoting *United States v. Kelly,* 72 M.J. 237, 242 (C.A.A.F. 2013)).

[56] *Baker*, 70 M.J. at 287 (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).

[57] *Id.* at 288 (quoting *United States v. Cowgill,* 68 M.J. 388, 390 (C.A.A.F. 2010)).

[58] Appellant's Brief of 25 Sep 2019 at 18.

[59] *Id.* at 19.

[60] 415 U.S. 164 (1974).

concluded that only the Western Digital drive had "clear indication of ownership";[61] and

(5) Focusing too much on ownership of the drives as viewed through property law instead of applying the *Matlock* test. Specifically, the Government argues the military judge failed to reconcile his finding that Ms. Yankee essentially publicly disclaimed ownership of the items with certain provisions of the couple's separation and divorce agreements that could tend to show that she rightfully retained the property.[62]

We find no abuse of discretion on the record here. While there is some evidence of possible joint use of one of the items (the purple-taped drive), the military judge's ruling considered and rejected that "the 12 devices were jointly used,"[63] further noting this argument was "contradicted by the Government's own MRE 404(b) and MRE 414 notices," in which the Government gave indication that the media *belonged to* Appellee.[64] While the military judge's discussion could have been more fully developed, we do not find that his treatment of the issue amounted to a failure to consider any important fact so as to constitute an abuse of discretion.[65] To the contrary, we determine that his ruling reasonably addressed the issues salient to the PASS, made relevant findings of fact supported by the evidence, and applied the correct legal principles to those facts to reach sound conclusions.

## C. Standard for Third Party Consent to Search

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."[66] A warrantless search is "*per se* unreasonable under the

---

[61] Appellant's Brief at 23.

[62] In these agreements, Appellee could only remove items from the home if Ms. Yankee agreed and the provision that each party was entitled to keep "the items currently in their possession." *Id.* at 24-25 (quoting App. Ex. X at 33).

[63] App. Ex. XXII at 12.

[64] *Id.* The notices show intent by the Government to present evidence that "[t]he accused kept a number of items on *his* Seagate Hard Drive*"* (the purple-taped drive) and "his 2GB MicroSD Card." *Id.* (emphasis in original) (quoting App. Ex. X at 76, 80).

[65] Having made this determination, we need not evaluate the Government's other claims of error in the military judge's ruling, as we will conduct a de novo review.

[66] U.S. Const. amend. IV.

Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."[67] When an accused challenges the propriety of a search, the Government bears the burden of proof to prove by a preponderance of the evidence that the search was not unlawful.[68]

Voluntary consent to search is one exception to the warrant requirement.[69] Under MRE 314(e)(2): "A person may consent to a search of his or her person or property, or both, unless control over such property has been given to another. A person may grant consent to search property when the person exercises control over that property." Consent to search must be proven by the Government by clear and convincing evidence.[70]

Under certain circumstances, a third party may lawfully consent to search of another's property. The validity of a third party's consent to search does not "hinge on the niceties of property law or on legal technicalities."[71] A third party may consent to search of another's property under any of the following three circumstances:

First, a third party's consent is valid if the consenting third party is also an owner of the property and can consent in her own right or if she is a "joint user" of the property.[72]

Second, a third party can give valid consent if she has "common authority" or an "other sufficient relationship" with the property such that the party's consent makes the search reasonable.[73]

Third, even if the third party was not competent to actually consent, the search *may* still be lawful if law enforcement officials reasonably believed the third party could consent—that she had apparent authority to consent.[74] However, apparent authority justifies a search only if "no facts . . . tended to show that the [law enforcement] agents should have reasonably known that the [property] was the exclusive property" of someone other than the consent-

---

[67] *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted).

[68] *See* Mil. R. Evid. 311(d)(5)(A).

[69] *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973).

[70] Mil. R. Evid. 314(e)(5).

[71] *United States v. Clow,* 26 M.J. 176, 183 (C.M.A. 1988).

[72] *See id.* at 176; *Frazier v. Cupp,* 394 U.S. 731 (1969).

[73] *Matlock,* 415 U.S. at 171.

[74] *See Illinois v. Rodriguez,* 497 U.S. 177, 185-87 (1990).

ing third party.[75] Also, pertinent to this case, apparent authority "probably" does not exist when the agent knows the spouse purporting to consent on behalf of the other person "is motivated by hostility."[76]

### D. Facts Outlining Ms. Yankee's Relationship with the Devices

Whether Ms. Yankee could consent to a search of the three devices turns on the nature of her interest in them through ownership, joint use, common authority, or another sufficient relationship.

Prior to their divorce, Appellee and Ms. Yankee lived together in their marital home, which was mortgaged in his name only. While they were together, Appellee owned and used a Mac laptop computer, and he permitted Ms. Yankee to use it. When Appellee had to travel for work, the couple purchased a computer for Ms. Yankee. Appellee also gave Ms. Yankee the passwords to certain of his accounts. However, since their split, he changed his passwords.

Ms. Yankee testified that she used the purple-taped drive to store pictures of her children and to periodically back up her phone data once or twice per year. She acknowledged that she had never used the Western Digital drive.[77] She stated the "memory cards" were hers from her cell phones or camera.[78] However, she later contradicted this statement when she said she never used any of the devices except for the purple-taped drive and the two Kindles.[79] While the couple lived together, the items were not stored or used in a specific place in the home. They were not password-protected or locked up. Appellee never said Ms. Yankee could not use them.

When the alleged victim's allegation first arose, Appellee was about to begin pre-deployment workups with the USS MAKIN ISLAND (LHD-8). He knew he would be at sea two or three weeks out of each month and would then deploy for six months. To avoid conflict with Ms. Yankee, in February 2016, he took some personal belongings and moved aboard ship.[80] Based on

---

[75] *United States v. Gallagher*, 66 M.J. 250, 252 (C.A.A.F. 2008).

[76] *Clow,* 26 M.J. at 188 n.14 (citing *Matlock,* 415 U.S. at 171).

[77] Record at 369.

[78] *Id.* at 352.

[79] *Id.* at 363.

[80] *See* App. Ex. XIII at 1; App. Ex. XXIII at 3 (finding of fact c.).

the limitations of shipboard life, he could not bring all of his personal property, the bulk of which remained in his marital home.[81]

Appellee sued for divorce in March 2016. Later that month, Appellee sent his father to his home to retrieve some personal items using his key. Appellee's father succeeded in retrieving some items, but then Ms. Yankee confronted Appellee's father and ordered him to leave before he could retrieve any further items. Then she changed the locks. From that point on, Appellee never regained access to his home until May 2017.

The couple last contacted one another in May or June 2016 when Appellee requested his uniforms and a "basket" of other military items.[82] Ms. Yankee threw the uniforms on the front lawn. She also began lodging complaints with Appellee's command. In response, on 16 June 2016, Appellee applied for and received a civilian restraining order against Ms. Yankee. One condition prohibited Ms. Yankee from disposing of Appellee's property. Appellee tried but failed to evict Ms. Yankee from the home. The restraining order was converted into a mutual no-contact order in August 2016 when the parties agreed to communicate only through their divorce attorneys, with the exception of emails relating to their house or debts. They also agreed to permit Appellee—with a third party present—to arrange an agreeable time and date to retrieve his property, but only if Ms. Yankee conceded the property was his. Ms. Yankee was not permitted to "unreasonably withhold permission" for Appellee to remove his property.[83]

Pursuant to these agreements, through counsel, Appellee requested return of some specific items, including "[a]ny and all misc[ellaneous] items on [the] side of bed drawers"[84] and "any additional items" of his "personal belonging."[85] Twice, through attorneys, Appellee arranged for his father to retrieve his personal property from the home. Twice, Ms. Yankee refused him entry.

Between the time Appellee moved out of the home in March 2016 and the time he returned from deployment in May 2017 and regained access to the

---

[81] *See* App. Ex. XIII at 2; App. Ex. XXIII at 3 (finding of fact c.).

[82] Record at 360.

[83] App. Ex. X, encl. 5.

[84] App. Ex. XIV. During the Article 39(a), UCMJ, hearing, LY indicated that the electronic items were sometimes stored in the bedroom drawers. Record at 363.

[85] *Id.*

home after Ms. Yankee moved out, Appellee was only able to recover a few items of his property. These were: the few items Appellee's father retrieved during his first abruptly-ended visit, the "basket" of military items, and the uniforms Ms. Yankee threw on the front lawn. However, during the Article 39(a), UCMJ, hearing, Ms. Yankee testified about her obligations during this time period, and she provided a different account. She testified that Appellee was "able to ask for things, and [she] was supposed to have them ready for him on a certain date, if that happened."[86] She also testified, "If he would have asked for [the electronics], I would have turned them over."[87] She denied wrongly impeding Appellee's access to his property while she was still living there. She testified he only requested the "basket" of military items and his uniforms, and she had very limited recall of any other requests.

When Appellee regained access to his home after Ms. Yankee moved out, he discovered that she left very little of his personal property, and it appeared she had deliberately sabotaged the home, which would become Appellee's asset after the divorce and on which he solely carried the mortgage. When his lawyers demanded Ms. Yankee return the property she took from the home that belonged to him, Ms. Yankee's lawyers responded in June 2017 on her behalf that she did not take *any* of Appellee's property and any missing items must be with Appellee's father.

Appellee submitted an affidavit in support of the motion and stated that "most of [his] personal property was taken from the home."[88] He never received most of the personal property items he requested. Appellee's father testified that Appellee twice arranged through counsel for Appellee's father to retrieve Appellee's property from the home. However, he testified Ms. Yankee twice blocked these pre-arranged attempts. The court accepted video documentation of Appellee's father's two failed attempts to retrieve Appellee's property. By the time Appellee could return to the home, his personal property was nowhere to be found. The house instead contained rotten food, bags of maggots, raw sewage, and garbage.[89]

In preparation for divorce, the parties drafted a stipulated settlement agreement. The document was made part of the final dissolution action when the divorce was finalized in September 2017. Each party listed their own

---

[86] Record at 377.

[87] *Id.* at 380.

[88] App. Ex. XIII at 3.

[89] *See* Record at 419-20 (testimony of Appellee's father).

"sole and separate property" and wrote that "failure to list a separate property asset . . . shall not create a community or any other interest" for the other spouse.[90] They agreed that each would retain each person's own personal property, including their own "personal effects."[91] Each party would retain the property they acquired before marriage. In a separate section, the parties agreed that as to the "furniture, furnishings, art work, antiques, tools, and appliances" that had already been separated, each person was entitled to keep the items in their possession.[92] Neither Appellee nor Ms. Yankee listed the 12 electronic items as their separate property or as community property allocated to either person.

## E. Owner or Joint User

Whether Ms. Yankee could consent to search of the three devices turns on the nature of her interest in them through ownership, joint use, common authority, or another sufficient relationship. We first analyze whether she was an owner or joint user.

### 1. Owner: Are they his or hers?

The military judge ruled that the electronic media belonged to Appellee. We agree. Although the electronics were undeniably in Ms. Yankee's *possession* when she turned them over to NCIS, the analysis must focus on whether she was a rightful owner. There is a conflict in the evidence about what Ms. Yankee told NCIS when she turned over the media, and how she described its ownership during the Article 39(a), UCMJ, session. Specifically, Ms. Yankee first told NCIS agents the electronics belonged to Appellee, but during the Article 39(a), UCMJ, hearing, she provided different statements. We interpret the facts in the light most favorable to the party prevailing below. We also take into account the military judge's findings of fact that Ms. Yankee made some false statements.[93]

---

[90] App. Ex. X at 32.

[91] *Id.* at 51.

[92] *Id.* at 31.

[93] The military judge found that Ms. Yankee made two apparent or actual false statements when she: claimed her lawyers told her she did not have to permit Appellee's family members to retrieve his property and when she told her lawyers that she did not have any of Appellee's property and that it must be in the house or in Appellee's father's possession. *See* App. Ex. XXIII at 11, Conclusions (7) and (8).

In May 2018, Ms. Yankee told the NCIS special agent receiving the items that they belonged to Appellee. The receiving special agent documented these statements in a written report.[94] When the agent asked Ms. Yankee to confirm whether they belonged to Appellee, Ms. Yankee replied, "Yes, they are his."[95]

In November 2018, when NCIS special agents gained Ms. Yankee's consent to search the items, they documented that Ms. Yankee said "the aforementioned items . . . were never requested by [Appellee] nor his attorney."[96] This statement inherently suggests Ms. Yankee was characterizing the items as belong to Appellee.

In March 2019, Ms. Yankee told the trial counsel that the items "had been abandoned in the house by [Appellee] for about a year," again representing that the items were Appellee's.[97] An agent documenting additional contact with Ms. Yankee wrote that Ms. Yankee had provided consent to search "several electronic devices [Appellee] abandoned in her residence."[98]

Based on Ms. Yankee's early representations, in April 2019, the trial counsel provided MRE 404(b) and 414 notice stating the Government's intention to offer evidence that Appellee maintained certain incriminating files on *his* items of media.

By time of the Article 39(a), UCMJ, hearing in July 2019, Ms. Yankee and the NCIS agents attempted to contest the accuracy of the NCIS reports, suggesting Ms. Yankee had said the items were shared. Trial counsel asked Ms. Yankee, "Did you tell them they were Major Taylor's?" to which Ms. Yankee responded, "I said they were ours."[99] Trial counsel responded, "Now, NCIS has a different view. They believe that when you came to me [the trial counsel] with [the electronics] in May of 2018, you told them that the

---

The military judge considered these statements as they relate to "assessing the credibility of [Ms. Yankee] since she did testify at the Article 39(a)" hearing. *Id.*

[94] *See* App. Ex. X at 25.

[95] Record at 407.

[96] App. Ex. XI at 17.

[97] *Id.* at 20.

[98] *Id.* at 21.

[99] Record at 371.

electronic devices are Major Taylor's. Do you recall saying that to NCIS?"[100] Ms. Yankee replied that she did not remember her exact words.

She also avoided the issue of ownership when she answered questions on direct examination, stating, "I just said these were the—these were anything and everything electronic that was in the house."[101] She said she took the 12 items of media because she "just took everything that [she] thought was [hers] or that was just laying around that [she] needed."[102] Later describing the items she took, she equivocated, "As far as I know, they were both of ours, they were in our house, we both used them or, I just packed it because I figured it probably had something to do with my kids."[103]

Interpreting the facts in the light most favorable to Appellee and considering the military judge's concerns with Ms. Yankee's credibility, we find that the military judge did not abuse his discretion by concluding that the items of media belonged to Appellee.

The Government contends the military judge abused his discretion by holding that the Western Digital Drive—the only item to show an indicia of ownership because it was labelled with Ms. Yankee's first name—belonged to Appellee. We disagree. The military judge stated that he considered all of the evidence and arguments of the parties. He was in a position to assess Ms. Yankee's credibility. Given the conflicting statements Ms. Yankee made on this issue, we do not believe this conclusion was "outside the range of choices reasonably arising from the applicable facts and the law."[104]

The Government argues the parties' legal agreements could be read to confer ownership of the items of media upon Ms. Yankee. We disagree. A close analysis of their divorce agreements does not resolve the issue of whether Ms. Yankee could rightfully retain the items of media. This issue turns on whether the drives were Appellee's personal property—a matter not conclusively established in the agreements. The Government argues that Appellee could have requested return of the three items of media; that he had requested a specific digital camera; and therefore his failure to request return of the three items is evidence the items were not his. We believe Appellee

---

[100] *Id.*

[101] *Id.* at 355.

[102] *Id.* at 354.

[103] *Id.* at 369.

[104] *Frost,* 79 M.J. at 109 (quoting *Kelly,* 72 M.J. at 242).

could not be reasonably expected to catalog, from memory, every single item that belonged to him in the marital home. Nor could he be expected to take every single item of his personal property with him to the ship when he first left. He abruptly left out of caution,[105] then, based on his ship's deployment schedule, a no-contact order, changed locks, a Military Protective Order, and Ms. Yankee's actions to repeatedly block his intermediaries, Appellee was unable to retrieve his property. Ms. Yankee said herself that she took the drives because she thought they might be of use to her—not that they were *hers* to take.[106]

Consistent with Ms. Yankee's earliest statements and the military judge's conclusion, we find that Ms. Yankee was not a rightful owner of the three devices.

### 2. Joint user?

The military judge acknowledged and rejected the Government's argument that Ms. Yankee "jointly used" the electronic media.[107] We agree with the military judge's conclusion.

On appeal, the Government argues Ms. Yankee was a joint user of, at a minimum, the purple-taped drive. Ms. Yankee testified she stored her children's photos on the drive and that she backed her phone up to it once or twice per year. The forensic examination revealed photos of Ms. Yankee's children were on the purple-taped drive, including the nude non-pornographic bath-time-style photos of the unknown female child. The forensic report does not show any evidence that Ms. Yankee ever used the hard drive to back up her phone, nor does the report demonstrate repeated use by Ms. Yankee.

The Government also argues "data *referencing* Ms. Yankee's Facebook account was found" on the purple-taped drive.[108] They later argue that Ms. Yankee "backed up . . . information from her Facebook account."[109]

---

[105] *See* App. Ex. XXIII at 3 (finding of fact c.).

[106] The Government notes that even if Appellee had specifically requested any of the items, the agreements required Ms. Yankee to consent to removal of any specific item. We do not find this provision controlling, and Ms. Yankee repeatedly and unequivocally told NCIS special agents the items belonged to Appellee.

[107] App. Ex. XXIII at 13.

[108] Appellant's Brief at 18 (emphasis added).

[109] *Id.* at 19.

However, the Government did not present evidence on these points; Ms. Yankee did not testify she used the drive in this manner. Rather, the forensic report indicated that some web artifacts "reference Facebook profiles" for Appellee and Ms. Yankee, with no further explanation of what that entailed.[110] Where the Government had the burden of proof by clear and convincing evidence to justify Ms. Yankee's consent to search,[111] we will not deduce from this cryptic notation in the forensic report that Ms. Yankee ever did such a thing. Because Ms. Yankee had used Appellee's computer, which was backed up on the purple-taped drive using the Time Machine backup program, any web artifacts or references to Ms. Yankee's accounts could be the result of her prior use, with Appellee's permission, of his laptop. Such web traces do not prove joint use of the hard drive itself.

Aside from the forensic report and the Government's interpretations of it, the Defense forensic examiner could find no evidence that the drive had been used any time after 2013—apparently contradicting Ms. Yankee's testimony that she used the drive once or twice per year. Considering the military judge's finding of fact that Ms. Yankee had lied or apparently lied in connection with this case, we consider the forensic evidence more credible than Ms. Yankee's statements. We therefore consider whether Ms. Yankee's act in storing her photographs on the purple-taped drive once during marriage is sufficient to constitute joint use such that she could consent to search of the drive, years later, after her divorce from Appellee.

The Government argues Ms. Yankee's use of the drive, even if just to store her photos, justifies her ability to consent. They argue that a "hard drive is a 'persistent storage' technology" on which information is "preserved even when [the device] is not powered."[112] Then they equate storage to use, analogous to leaving an item in a "warehouse, library, or computer memory."[113] And they argue Ms. Yankee's "use" by means of storing certain data was a continuous use that persisted until she turned the items over to NCIS agents.

Under these facts, we reject this continuous use argument. This case is distinguishable from the joint-use cases the Government cites. In *United*

---

[110] App. Ex. XI at 30.

[111] *See* Mil. R. Evid. 314(e)(5).

[112] Appellant's Reply Brief of 9 Dec 2019 at 5. (alteration in original) (citation omitted).

[113] *Id.* (quoting *Store,* Merriam-Webster.com).

*States v. Matlock,* the appellant and his roommate were joint occupants of a bedroom, and at the time his roommate consented to the search, they variously represented themselves as a married couple.[114] Likewise, in *Frazier v. Cupp,* a duffel bag was actively being shared between the owner and his cousin, and Frazier left the duffel bag in his cousin's home.[115] In each case, there was an ongoing intention, at the time the third party consented to search, for the rightful owner to share the property or premises with the person who consented to the search. In each case, there was an action on the part of the true owner to assume the risk that the joint occupant or user would consent to a search.[116] We find no such action here.

Therefore, we find Ms. Yankee lacked actual authority to consent as an owner or joint user of the three items of media.

## F. Common Authority or Sufficient Relationship

In *United States v. Matlock,* the Supreme Court held that a third party could give valid consent to search if she possesses "common authority over or other sufficient relationship to the . . . effects sought to be inspected."[117] The Court, in a footnote, defined "common authority" as resting:

> on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[118]

The Supreme Court did not specifically define an "other sufficient relationship" in *Matlock,* but our superior court interpreted both "common authority" and "other sufficient relationship" in the marital context in *United States v. Clow.*[119]

---

[114] 415 U.S. 164 (1974).

[115] 394 U.S. 731 (1969).

[116] "By allowing the cousin the use of the bag, and by leaving it in his house, Frazier was held to have assumed the risk that his cousin would allow someone else to look inside." *Matlock,* 415 U.S. at 171 (citing *Frazier,* 394 U.S. at 740).

[117] *Id.*

[118] *Id.* at 171 n.7.

[119] 26 M.J. 176 (1988).

In *Clow,* the CAAF first outlined several federal and state cases involving third party consent to a spouse's property by an estranged spouse. The court held that "absent a clear showing that one spouse ha[d] 'exclusive use' of some area within the marital residence[,] . . . a spouse's access to the marital residence should be treated as access to all parts of that residence and to the contents of any furniture or containers located there."[120]

The court affirmed that Clow's husband could consent to search within a piece of furniture in her room. The couple was still married, although the husband had moved out. The appellant had her own room, even when the couple cohabitated. But the appellant never changed the apartment door lock and the husband: still had two sets of keys; came and went without announcing himself and stayed overnight; and maintained some property in the home but said *the appellant* could dispose of it if she wanted. As such, the appellant in *Clow* either actively permitted or passively condoned the husband's continued access to the premises, which justified his ability to consent to the search. The court held that "[h]is ability to give valid consent to a search . . . stemmed from his own 'relationship to the premises.'"[121]

Also in *Clow,* the CAAF cited several cases involving third party consent in the context of a martial split, as that split was ongoing and the couple still jointly occupied a residence to some degree. Each person had common access to the martial home and control of the premises. Having a key, with knowledge of the other cohabitant, was viewed as common access.

The Government argues the military judge failed to adequately address common authority or analyze whether an "other sufficient relationship" existed. We disagree. In his ruling in this case, the military judge appropriately noted that "common authority" is a separate issue from property law.[122] He quoted *United States v. Matlock,* footnote 7 (quoted above), and then, considering both Ms. Yankee's lack of ownership and wrongful possession, concluded she could not lawfully consent to the search.[123] The military judge cited both *Matlock* and *Clow* and specifically recited that an "other sufficient relationship" could justify third-party consent.[124] Furthermore, in *Clow,* our superior court treated "common authority" and "other sufficient relationship"

---

[120] *Id.* at 187.

[121] *Id.* at 187-88 (quoting *Matlock,* 415 U.S. at 171).

[122] App. Ex. XXIII at 10.

[123] *Id.*

[124] *Id.* at 9-10.

as being similar. Discussing the facts of a New Mexico case, the CAAF wrote that a "'sufficient relationship' existed [in that case], because defendant's 'wife had a key' and 'a right to occupy the premises' and because she had 'use[d] the residence to some extent.'"[125] We do not find that the military judge's handling of these issues constituted an abuse of discretion, and we agree with the military judge's conclusion that Ms. Yankee lacked authority to consent.

The Government argues that Ms. Yankee had a sufficient relationship with the drives and could consent to search them because she had free access to them in the home and because she used the purple-taped drive. We address these issues in turn.

### 1. Common authority based on past access in the marital home

The Government argues the holding in *Clow* requires this Court find Ms. Yankee could consent to a search of the media. It appears that Ms. Yankee had free access to the 12 media devices while she lived together with Appellee as husband and wife. The Government seeks to have us parlay Ms. Yankee's unfettered access while living with Appellee into her ability to consent, years later, to a search of *his* property that she had barred him from retrieving and then wrongfully retained after the marriage ended. We believe this case is altogether different from *Clow* and other common authority cases cited by the Government.

By contrast to the facts in *Clow,* this case is more similar to *Illinois v. Rodriguez.*[126] In *Rodriguez,* the Supreme Court held that a third party ex-girlfriend, who had a key that she took *without* the appellant's knowledge, did not have common authority to consent to a search of the premises.[127]

We find that *Clow,* and the logic underlying the cases outlined within it, does not control the outcome in this case. Appellee did nothing to actively permit or knowingly condone Ms. Yankee's possession or use of the media. He did nothing to "assume[] the risk" that Ms. Yankee would consent to the

---

[125] *Clow,* 26 M.J. at 186 (alteration in original) (quoting *State v. Madrid,* 574 P.2d 594, 597 (N.M. Ct. App. 1978)).).

[126] 497 U.S. 177 (1990).

[127] *Id.* at 181-82 (finding third party had no common authority over the searched apartment when she had moved out a month before the search, only went to the house with permission, did not pay rent, and had a key only because she took it without permission, but remanding for lower court to determine whether the search was justified by apparent authority).

search.[128] By the time Ms. Yankee was approached for the PASS in November 2018, Appellee had been out of the marital home with no further unrestricted access to his property for 33 months, and the couple's divorce had been finalized for 18 months. Nothing Appellee *actually did* in November 2018 gave Ms. Yankee authority over his property. In fact, Appellee had been repeatedly thwarted from retrieving his property and had even tried to evict Ms. Yankee from the home. Had he succeeded in the eviction, she would not even have had access to, much less authority over, his personal property.

The facts of this case are thus drastically different from the cases in which courts have found a common authority or other sufficient relationship existed, where there is typically a temporal aspect to the property owner's actions giving rise to common authority by the third party. In *Clow, Matlock,* and *Frazier,* the true property owner was involved in some voluntary action or inaction vis-à-vis the property or premises (electing not to change the locks even though a third party kept using his key, for example) that was close in time to the third party giving valid consent to search.

There is no similar temporal link present here. Although the couple shared his computer and shared items in the marital home during the marriage, Appellee evidenced an intention to exclude Ms. Yankee from his property as the couple was divorcing and after they divorced. He changed the passwords to his accounts, and he repeatedly petitioned to have his personal property returned. We do not extrapolate Ms. Yankee's *past* permissive access to Appellee's media into giving Ms. Yankee common authority over his items after she wrongfully withheld them and after the couple eventually divorced.

*2. Common authority based on Ms. Yankee's past use of the purple-taped drive*

In this case, Ms. Yankee's relationship to the purple-taped drive was that she had previously stored files on it. The apparent last-accessed date was in 2013, although the Defense expert stated the accuracy of this date depended upon the accuracy of the clock of the computer to which the drive was attached. Viewing the evidence in the light most favorable to the party prevailing below, we will view the drive as having been unused since 2013.[129]

---

[128] *Frazier,* 394 U.S. at 740.

[129] Even according to Ms. Yankee's testimony, she used the drive infrequently.

Other than this use, Ms. Yankee had the drive only because she essentially stole it.[130]

We must determine whether use, years prior, of another's electronic media gives that user continued common authority over the device to consent to a search of that media years later. We hold that it does not. The consequences of a contrary holding would be astounding. If a person permitted a friend to use his personal computer to check email and the friend saved a file to the computer, we would not hold that the friend could then consent to a search of the computer years later, even after the relationship was severed. The result would be absurd whether or not the friend intended to seek return of the saved file years later, and the result would be absurd whether or not the computer's owner knew the friend intended to save a file to the computer.[131] The same logic applies to Ms. Yankee's use of Appellee's purple-taped drive.

Nothing in *United States v. Rader,*[132] cited by the Government, dictates a different result. In *Rader*, the appellant permitted his roommates to access his computer without any limitations, and this shared access was ongoing, with Rader's full knowledge and agreement, at the time one of Rader's roommates consented to search the computer. Although in this case Ms. Yankee and Appellee may have shared access akin to that in *Rader* at some point,[133] the situation had changed significantly by May 2018 (when Ms. Yankee turned over the items to NCIS) and November 2018 (when she executed a PASS for the items). By the time Ms. Yankee gave consent to search Appellee's electronics, they were less than friends or even former houseguests—they were antagonistic, mutually-opposed parties. While Ms. Yankee still had the items of media in her possession, this was not because of any thought-out division of property or affirmative choice on Appellee's part to specifically abandon the property or give it to Ms. Yankee.

---

[130] The military judge found that Ms. Yankee was "not in lawful possession of the devices when she turned them over to NCIS on 21 May 2018." App. Ex. XXIII at 10 (Conclusion (4)). We agree.

[131] Another analogy would be permitting a guest to leave a small item of property in the owner's house and finding that, years later, that guest could consent to search of the entire house.

[132] 65 M.J. 30 (C.A.A.F. 2007).

[133] Even by Ms. Yankee's testimony, her use was infrequent, which is less than the ongoing use in *Rader.*

In sum, that Ms. Yankee had the items of media in her possession in May 2018 does not convince us that she had common authority over them or another sufficient relationship to justify her consent to a search. Common authority is based upon assumption of the risk. We do not believe Ms. Yankee's permissive use of the purple-taped drive during marriage caused Appellee to assume the risk that his ex-wife would then consent to a search of the drive she wrongfully retained years later.

## G. Apparent Authority to Consent

Based on substantial information showing Ms. Yankee's animosity toward Appellee, and her statements disclaiming ownership of the media, the military judge ruled the NCIS agents could not reasonably believe she could consent. We agree.

As an initial matter, we note that the operative times to analyze regarding the reasonableness of the special agents' belief are the time they received the evidence (seizure) and the time they solicited permission to search it (by asking Ms. Yankee to sign a PASS). To hold otherwise would allow post-hoc rationalization—after the benefit of consultation with counsel—to justify actions that took place earlier in time. Therefore, when considering apparent authority, we look only to the facts known to the NCIS agents at the time of seizure and of obtaining consent to search.

In an effort to meet its burden on this point, the Government presented the testimony of NCIS Special Agent Edward Alpha, the agent who asked Ms. Yankee to sign the PASS. Initially, the agent testified on direct examination that Ms. Yankee portrayed all of the devices as jointly-used family devices that Appellee had abandoned. The agent confirmed that "based off of *this understanding* of the devices," he requested a PASS.[134] He also testified he believed Ms. Yankee could consent because Ms. Yankee claimed Appellee had numerous chances to request and receive return of his property—requests with which Ms. Yankee claimed she complied. Therefore, the agent testified that he concluded Appellee had abandoned the devices and Ms. Yankee could consent to search them.

On cross-examination, however, it became apparent that Special Agent Alpha was conflating his March 2019 interview with Ms. Yankee with his November 2018 interview. As such, he was, perhaps inadvertently, imparting his later knowledge to his decision-making process in November 2018. This is

---

[134] Record at 388 (emphasis added).

not the proper analysis for apparent authority to consent. All of the details about claimed joint use and abandonment were included in the report of Ms. Yankee's March 2019 interview, not her November 2018 interview. None of these later details could have influenced the agents' decision-making process in November 2018, which is the relevant time period for assessing the reasonableness of the agents' actions.[135]

Confining our review to the information known to the NCIS agents at the time they asked Ms. Yankee to consent to search, we find there was not apparent authority for the same two reasons the military judge identified. First, the agents knew Ms. Yankee was purporting to consent to search electronics she unequivocally stated did not belong to her. Second, the agents had reason to know that Ms. Yankee was acting out of animosity toward Appellee.

As for the first reason, we note that Ms. Yankee made contradictory statements about the ownership of the electronics. According to the facts known to them at the time, as detailed above, the agents actually believed the items all belonged to Appellee—not to Ms. Yankee.[136] By the time of the Article 39(a), UCMJ, hearing, the trial counsel apparently contested the accuracy of the NCIS reports on this point. Whatever the accuracy of NCIS's reports, the Government relied upon them[137] and the reports document what the NCIS agents *knew and thought* about the ownership of the devices. They believed—and recorded in their official reports—that Ms. Yankee was consenting to search devices she clearly stated she did not own. As relates to apparent consent, we find it was not reasonable for the agents to believe Ms. Yankee could consent to the search.

Second, when considering apparent consent, this Court may consider animosity among the parties, and when the law enforcement official should reasonably know the third party is motivated by animus, a search may not be

---

[135] Special Agent Alpha testified that he could recall, in July 2019, that Ms. Yankee had said in November 2018 that the items were abandoned. He conceded that detail was not included in the November 2018 report and stated that "[n]ot every detail always ends up in reports," but that "[o]ften times, there are notes that are taken." Record at 399. No notes in the record document this statement by Ms. Yankee.

[136] *See supra,* Para III(E)(1), discussing Ms. Yankee's statements regarding ownership of the drives.

[137] App. Ex. X at 76, 80 (referring to "his" hard drive and "his" MicroSD card).

justified by apparent consent.[138] Here, Ms. Yankee acted out of hostility toward Appellee, and there was substantial evidence of this known to NCIS at the time they asked her consent to search. The military judge listed the pertinent facts in his ruling. In addition to those facts, the agents also knew that Ms. Yankee's allegations against Appellee grew as time passed. Whereas she initially did not believe the alleged victim, she later made allegations of her own. She alleged Appellee raped her, searched for barely-legal pornography, fraternized and committed adultery soon after they were married, and sent nude photographs to a 16-year-old girl. Whether the allegations are true or false, at a minimum, they demonstrate that, in November 2018, agents had reason to believe Ms. Yankee bore significant animosity against Appellee. Therefore, we do not believe the search can be justified based on apparent consent.

We find Ms. Yankee could not consent to a search of the three devices, nor could she apparently consent. Therefore, the search was unlawful.

## H. Good Faith, Inevitable Discovery, and the Military Rule of Evidence 311(a)(3) Balancing Test

The Government does not contest the propriety of the military judge's conclusions of law on these points. We review them briefly and find the military judge's conclusions did not constitute an abuse of discretion, reviewing his findings of fact under a clearly erroneous standard and his conclusions of law de novo.

First, the MRE 311(c)(3) good faith exception is only implicated when agents rely in good faith on a search authorization. The exception does not apply in this case, where the agents did not seek or receive a search authorization.

Second, as relates to inevitable discovery, the military judge noted that Special Agent Alpha testified that "NCIS was not pursuing evidence of child pornography" offenses at the time of the search.[139] He also noted that the agents "allowed the 12 devices to sit for 165 days" without seeking a command authorization for search and seizure.[140] His conclusion that the evidence would not have been inevitably discovered does not constitute an abuse of discretion.

---

[138] *Clow*, 26 M.J. at 188 n.14.

[139] App. Ex. XXIII at 19.

[140] *Id.* at 17.

Finally, as relates to the MRE 311(a)(3) balancing test, we agree with the military judge's conclusion that the test weighs in favor of exclusion,[141] since "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system."[142] We agree with the military judge's conclusion that the costs to the justice system would be "minimal" because the evidence is of "questionable . . . admissibility," may not even be relevant to this case,[143] and is "ancillary to the charged offense[s];"[144] hence, no specification will have to be dismissed as a result of the suppression of this evidence. As compared to these minimal costs to the justice system, we agree with the military judge's conclusion that "appreciable deterrence would result from exclusion of the evidence."[145] We too, are concerned that the agents apparently took no action for months, potentially because they knew they lacked probable cause, and then pursued the unreasonable course of asking for Ms. Yankee's consent to search property she said belonged to her ex-husband, against whom she bore substantial ill will. The military judge's application of the MRE 311(a)(3) balancing test does not constitute an abuse of discretion.

## IV. CONCLUSION

We find we have jurisdiction to consider the Government's appeal as it pertains to:

(1) the iMicro brand hard drive held together purple tape [purple-taped drive];

(2) the 500GB Western Digital brand hard drive [Western Digital drive]; and

(3) the 2GB MicroSD memory card [memory card].

---

[141] The Government did not contest MRE 311(a)(1) or (2).

[142] Mil. R. Evid. 311(a)(3).

[143] App. Ex. XXIII at 18. Specifically, the child depicted in the non-pornographic images is not identifiable and may not be the alleged victim, and the evidence that Appellee knowingly possessed child pornography is "weak." *Id.*

[144] *Id.*

[145] *Id.* at 17.

As pertains to these three items, the Government's appeal pursuant to Article 62, UCMJ is hereby **DENIED**. The record of trial is returned to the Judge Advocate General for further action not inconsistent with this opinion.

Judges LAWRENCE and STEPHENS concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court